**ALEX FILIAS**
**July 29, 2005**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C. A. NO. 0412029DPW


EDWARD MARSHALL,

    Plaintiff

VS.

FILIAS REALTY TRUST,

    Defendants


    DEPOSITION OF: ALEX FILIAS

    Orlando & Associates

    One Western Avenue

    Gloucester, MA 01930

    Friday, July 29, 2005

    10:50 A.M.


THOMAS J. HOUTON, COURT REPORTER

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exhibit "B"*

ALEX FILIAS
July 29, 2005

Page 2

```
 1   APPEARANCES:
 2
 3   Representing the Plaintiff:
 4      Orlando & Associates
 5      One Western Avenue
 6      Gloucester, MA 01930
 7      (978) 283 8100 FAX: (978) 283 8507
 8      BY: BRIAN MCCORMICK, ESQ.
 9
10   Representing the Defendant:
11      Morrison & Mahoney, LLP
12      250 Summer Street
13      Boston, MA 02210
14      (617) 737 8866 FAX: (617) 342 4896
15      BY: JEFFREY D. KIESLING, ESQ.
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1           I-N-D-E-X
 2   WITNESS          DIRECT  CROSS
 3   ALEX FILIAS         4      —
 4
 5
 6
 7   EXHIBIT:          PAGE:
 8   Exhibit 1, Notice     7
 9   Exhibit 2, Diagram    40
10   Exhibit 3, Drawing    67
11   Exhibit 4, Permit     71
12   Exhibit 5, Lease      82
13   Exhibit 6, Letter     86
14   Exhibit 7, Photo      94
15   Exhibit 8, Photos     98
16   Exhibit 9, Photos     101
17   Exhibit 10, Photos    102
18   Exhibit 11, Photo     108
19
20
21
22
23
24
```

Page 4

```
 1        MR. MCCORMICK: The usual
 2   stipulations okay Jeff?
 3        MR. KIESLING: Say them on the
 4   record.
 5        MR. MCCORMICK: I will. So we
 6   have agreed among counsel to hold all
 7   objections, except those as to the form of the
 8   question and motions to strike until the time
 9   of trial.
10        What would you like to do about
11   reading and signing?
12        MR. KIESLING: Can I wait to the
13   end?
14        MR. MCCORMICK: Yes.
15
16        ALEX FILIAS, first being duly
17   sworn and identified, deposes and says as
18   follows:
19
20        DIRECT EXAMINATION
21
22   Q.  (By Mr. McCormick) Good morning Mr.
23   Filias. We met outside, but just again for
24   the record, my name is Brian McCormick and I
```

Page 5

```
 1   represent Ted Marshall in this case.
 2   A.  Okay.
 3   Q.  I have some questions for you this
 4   morning. If at any time you don't understand
 5   my question, please let me know and I'll
 6   rephrase it. Okay. And just a couple of
 7   other ground rules to make things easier. If
 8   you, if I ask you a question that calls for a
 9   yes or no answer, you can try to remember to
10   verbalize yes or no instead of shaking your
11   head or saying uh-huh or uh-uh, we'll get a
12   clean record and your testimony will be
13   accurate.
14   A.  Okay.
15   Q.  You will forget that and we will
16   remind you, so don't worry about it. That is
17   just to let you know. The other thing is if
18   you can remember to let me finish my question
19   before you start your answer, I'll let you
20   finish your answer before I start my question.
21   We can make the Stenographer's job a lot
22   easier, because if we talk over each other it
23   is really tough for the Stenographer. Other
24   than that if you need a break at any time for
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

**ALEX FILIAS**

**July 29, 2005**

---

Page 6

1  any reason, you want to make a phone call,
2  whatever, use the bathroom, anything, just let
3  me know and we can stop, it is not a problem
4  at all.
5      If you need to speak with Mr.
6  Kiesling at any point than that is your right
7  as well. But the only stipulation in that is
8  if I have a pending question before you, I
9  would ask that you answer that question before
10 you have a conference with your lawyer. Other
11 than that if you want to talk to Jeff, you
12 know, off the record, I will give you some
13 privacy. You are certainly free to do that,
14 okay?
15     A.  Yes.
16     Q.  All right. Will you state your name
17 and address?
18     A.  Alex Filias, One Wood Hollow Road,
19 Manchester, Mass.
20         MR. MCCORMICK: Off the record,
21 please.
22
23         (Off record discussion)
24

---

Page 7

1         MR. MCCORMICK: Back on the
2  record. I'm just going to mark the Notice of
3  Deposition. Here is our first Exhibit,
4  please.
5
6         (Exhibit 1 marked)
7
8         MR. MCCORMICK: I'm just going to
9  show this to opposing counsel. I'll just ask
10 you Mr. Kiesling, once you have reviewed it if
11 you could, you would be willing to stipulate
12 that Mr. Filias is the person produced by
13 Filias Realty Trust, or we may have to rename
14 the defendant in this case as most
15 knowledgeable in the topics designated.
16        MR. KIESLING: We'll stipulate to
17 that.
18        MR. MCCORMICK: Okay, thank you.
19     Q.  All right. Are you presently
20 employed Mr. Filias?
21     A.  Yes.
22     Q.  For whom do you work or ----
23     A.  Self-employed.
24     Q.  Self-employed, okay. What kind of

---

Page 8

1  work do you do?
2      A.  Construction, property management.
3      Q.  When you say self-employed, do you
4  have a company or do you just work as Alex
5  Filias d/b/a?
6      A.  No, just Filias Construction Corp.
7      Q.  Okay. Is that a small, is that a
8  Massachusetts corporation?
9      A.  Yes. We are out of Manchester.
10     Q.  Are you the President of that
11 corporation?
12     A.  Yes.
13     Q.  Just generally what type of work do
14 you do with respect to your relationship with
15 Filias Construction Corp?
16     A.  I manage and oversee all work. What
17 type of work do we do for clients?
18     Q.  Yes.
19     A.  We build custom homes and site work.
20     Q.  And when you say site work, are you
21 talking about like excavation?
22     A.  Yes.
23     Q.  Landscaping also?
24     A.  A little bit.

---

Page 9

1      Q.  So Filias Construction Corporation
2  would it be fair to say that it is a build,
3  that you are builders?
4      A.  Yes.
5      Q.  Do you also do additions and things
6  like that to people's homes?
7      A.  Yes.
8      Q.  Or is it mostly construction?
9      A.  Yes.
10     Q.  Additions as well?
11     A.  H'm-h'm.
12     Q.  Now I'm just trying to, I have named
13 the company as Filias Realty Trust, but I
14 think that we have indicated, Jeff, do you
15 know the actual name of the, is it 138 Main
16 Street?
17         MR. KIESLING: The women were
18 working at 138 Main Street Trust.
19         MR. MCCORMICK: Did that come out
20 as a question for the record?
21         MR. KIESLING: No, it didn't.
22     Q.  Let me just, are you familiar with an
23 entity, a legal entity known as 138 Main
24 Street Realty Trust, Mr. Filias?

---

3  (Pages 6 to 9)

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 10

1    A.   Yes.
2    Q.   And you are a beneficiary of that
3  trust?
4    A.   Trustee.
5    Q.   Trustee, okay.  Do you know also if
6  you were a beneficiary or just a trustee, if
7  you know?
8    A.   I'm not sure.
9    Q.   Before we get into that, I just want
10 to just finish up with your background a
11 little bit, and then we'll move into that.
12 How long have you been working in the field of
13 construction and building and things like
14 that, how many years?
15   A.   At least 20.
16   Q.   Has it always been in connection with
17 Filias Construction Corp. that you have been
18 involved in that type of work?
19   A.   Yes.
20   Q.   And Filias Construction Corp., let me
21 just ask you a little bit about your
22 particular role with respect to that company,
23 are you a hands on guy that actually goes out
24 to job sites and bangs nails?

Page 11

1    A.   Yes.
2    Q.   Do you direct and supervise work?
3    A.   Yes.
4    Q.   Do you hire subs on the jobs?
5    A.   Yes.
6    Q.   Would it be fair to say that you have
7  a good working knowledge of construction
8  practices and things of that nature?
9    A.   Yes.
10   Q.   Now did you tell me that Filias
11 Construction Corp does it also manage
12 properties, or is that strictly a construction
13 company?
14   A.   Filias Construction manages apartment
15 buildings.
16   Q.   So are you also in addition to doing
17 the physical hands on type work that we have
18 talked about, well, let me back the question
19 up now.  Would it be fair to say that Filias
20 Construction Corporation often times acts as a
21 general contractor with respect to certain
22 construction projects?
23   A.   To the property?
24   Q.   No, back to building again.  When

Page 12

1  you're building buildings are you acting as GC
2  most of the time?
3    A.   Yes.
4    Q.   In addition to, and you have
5  indicated what types of work do you personally
6  do with respect to that undertaking.  My
7  question is what role do you personally play
8  with respect to the management of properties,
9  if any?
10   A.   I'm in charge of the properties.
11   Q.   Okay.  What is, just generally, what
12 does that entail for you personally in your
13 job?
14   A.   Well, it's mostly field things that
15 would happen at any property taking care of
16 plumbing things, electrical things, roofing
17 issues, repair broken windows, you know, just
18 general maintenance of the property.
19       MR. KIESLING: Can we go off the
20 record?
21       MR. MCCORMICK: Sure.
22
23       (Off record discussion)
24

Page 13

1       MR. MCCORMICK: Back on the
2  record.
3    Q.   Do you also, do you personally Mr.
4  Filias, get involved in the collection of
5  rents, or does somebody else deal with that?
6    A.   That was typically handled at the
7  office.
8    Q.   Where is the office?
9    A.   That's 19 Desmond Avenue, Manchester.
10   Q.   All right.  Very briefly can you tell
11 me what your educational background is?
12   A.   High School graduate.
13   Q.   Are you specialized training after
14 that, courses in any particular discipline?
15   A.   No.
16   Q.   Did you ever take any engineering
17 courses or anything like that?
18   A.   No.
19   Q.   All right.  Any architecture courses?
20   A.   No.
21   Q.   What about with respect to marine
22 related endeavors, do you have any, ever had
23 any special training in any marine related
24 activities?

4 (Pages 10 to 13)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

Exh. "B"

**ALEX FILIAS**
**July 29, 2005**

Page 14

1    A. No.
2    Q. Post high school?
3    A. No.
4    Q. Do you have any Coast Guard licenses?
5    A. No.
6    Q. Based on your testimony you have
7    never taken any courses in marine architecture
8    of design?
9    A. No.
10   Q. All right. Now we'll move to the
11   topic at hand. We started talking about the
12   138 Main Street Realty Trust. I think you
13   indicated that you believe you're a trustee of
14   that trust, correct?
15   A. Yes.
16   Q. Okay. What is your understanding of
17   what your duties and responsibilities are as a
18   trustee of the 138 Realty Trust?
19   A. What are my responsibilities?
20   Q. Yes.
21   A. I'm not sure.
22   Q. Okay. With respect to Filias
23   Construction Corp., does that company manage
24   the, well, let's establish what we're talking

Page 15

1    about here. Main Street in Essex there are
2    some apartment buildings down there and there
3    are some slips, boat slips off of those
4    apartment buildings, you know the area that
5    I'm talking about?
6    A. Yes.
7    Q. Do those apartments have a particular
8    name that you refer to them as?
9    A. We just call them 138 Main Street.
10   Q. All right.
11   A. Or the Landing apartments.
12   Q. Okay, or Landing, okay. I just want
13   to establish a name that we can both, we'll
14   just call them the Landing apartments from
15   this point forward in the deposition.
16   A. That's fine.
17   Q. Now the Landing apartments are they
18   managed by Filias Construction Corp.?
19   A. Yes.
20   Q. Again that is with respect to those
21   with the Landing apartments, Filias
22   Construction Corp. would oversee the
23   maintenance and repair issues on the
24   apartments?

Page 16

1    A. Yes.
2    Q. Are those, not you personally, but
3    somebody else would handle the collecting of
4    rents from tenants and things like that?
5    A. Yes.
6    Q. Do you have any idea, and if you
7    don't fine, just tell me Mr. Filias, who are
8    the beneficiaries of the 138 Main Street
9    Realty Trust are?
10   A. I'm not sure.
11   Q. Do you have an understanding of what
12   properties are held within the 138 Main Street
13   Realty Trust, what real estate?
14   A. It's own property.
15   Q. So that trust would be fair to say
16   that trust holds the real estate at 138 Main
17   Street in Essex, Mass.?
18   A. As far as I know.
19   Q. I want to you talk to you a little
20   bit about the Landing apartments. Are there
21   some slips adjacent to those apartments on the
22   Essex River?
23   A. Yes.
24   Q. Does the Realty Trust in question 138

Page 17

1    Main Street Realty Trust, as far as you know,
2    own those slips?
3    A. Yes.
4    Q. Does Filias Construction Corp. manage
5    those slips?
6    A. We do what it takes to get them in
7    the water. We set them up.
8    Q. Okay. You mean the docks and the
9    peers and all that?
10   A. Yes.
11   Q. What about the rental fees for the
12   boats that rent there, was that processed
13   through Filias Construction Corp. also as far
14   as you know?
15   A. The same office.
16   Q. As we sit here today Mr. Filias, do
17   you know how many usual slips there are in
18   that, off of that peer?
19   A. Let's see, approximately 16, I think.
20   Q. Answer these questions as best you
21   can. If you don't know, just let me know. Do
22   you have an understanding in terms of what the
23   trust owns vis-a-vis slips? And what I mean
24   by that is does it, let me break it down. The

5 (Pages 14 to 17)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

*Exh. "B"*

ALEX FILIAS
July 29, 2005

| Page 18 | Page 20 |
|---|---|
| 1  trust owns the physical peers extended to the | 1  times? |
| 2  water. | 2    A.  Yes. |
| 3    A.  The 138 Main Street Trust? | 3    Q.  Do you know how long the trust had |
| 4    Q.  Right. | 4  actually owned the slips? |
| 5    A.  Yes. | 5    A.  I think since '03, I believe since |
| 6    Q.  Okay.  Do you have any, do you know | 6  '03. |
| 7  whether, I'm just going to call it the trust | 7    Q.  Let me ask the question differently. |
| 8  just so that we don't ---- . | 8  The land where the landing apartments were on, |
| 9    A.  Okay. | 9  do you know how long the trust has owned that |
| 10    Q.  Do you know if the Trust owns any | 10  whole complex? |
| 11  portion of the land and part of the river bed | 11    A.  I'm pretty sure since '03. |
| 12  underneath those structures? | 12    Q.  '03? |
| 13    A.  As far as I know to own to the mean | 13    A.  Yes. |
| 14  water. | 14    Q.  So I don't know where I got the |
| 15    Q.  Okay.  Is that the low tide marker? | 15  impression, but I had the impression that the |
| 16    A.  I believe so. | 16  land itself, again where the landing |
| 17    Q.  If you would be so kind, if you could | 17  apartments are had been in under the, within |
| 18  just give me as best you can a little idea of | 18  the Filias family for like decades.  Am I |
| 19  what this looks like how does one access the | 19  wrong about that? |
| 20  boat, can you just kind of describe the layout | 20    A.  Well, you asked about the 138 Main |
| 21  of the peer for me at the dock? | 21  Street Trust. |
| 22    A.  It has a walkway.  (Indicating) | 22    Q.  Okay, I see.  Okay.  I understand. |
| 23    Q.  Okay. | 23  You're right. |
| 24    A.  To a gangway that goes up and down. | 24      MR. KIESLING: Can we go off the |

| Page 19 | Page 21 |
|---|---|
| 1    Q.  Okay. | 1  record? |
| 2    A.  And then do the float, floatation | 2      MR. MCCORMICK: Yes. |
| 3  units. | 3 |
| 4    Q.  Is the walkway the first part that | 4      (Off record discussion) |
| 5  you described, is that on land? | 5 |
| 6    A.  Yes. | 6      MR. MCCORMICK: Back on the |
| 7    Q.  Okay.  Then it leads to the gangway? | 7  record. |
| 8    A.  Yes. | 8    Q.  Let me just clarify that.  Okay, Mr. |
| 9    Q.  That goes up and down with the tide? | 9  Filias, I understand your answer.  At some |
| 10    A.  Right. | 10  point did the name of the trust that owns that |
| 11    Q.  That leads out to the floating dock, | 11  area of land where the Landing apartments are, |
| 12  is that right? | 12  did that change the name? |
| 13    A.  Yes. | 13    A.  Yes. |
| 14    Q.  How many sessions of dock are there | 14    Q.  When was that? |
| 15  in the water side of the gangway, if you know? | 15    A.  January '03. |
| 16    A.  I'm not sure. | 16    Q.  Do you know what it changed from? |
| 17    Q.  Is it broken down into sections, is | 17    A.  Filias Realty Trust. |
| 18  that how it works? | 18    Q.  Okay.  To the 138 Main Street Trust, |
| 19    A.  Yes. | 19  is that right? |
| 20    Q.  Into sections? | 20    A.  Yes. |
| 21    A.  Yes. | 21    Q.  Do you have any idea why the name of |
| 22    Q.  Do you know how long, again I'm | 22  the trust changed? |
| 23  referring to the trust, I mean 138 Filias, so | 23    A.  It was just a restructure I believe |
| 24  that I just don't have to say that a thousand | 24  because it was for possibly for tax reasons or |

6 (Pages 18 to 21)

Exh. "B"

**ALEX FILIAS**
**July 29, 2005**

Page 22

1  what have you.
2    Q.  Okay. Let me take a step back before
3  the transfer from the 138, from the 138 Realty
4  Trust to the 138 Main Street. Do you know how
5  long the Filias Realty Trust owned that
6  property prior to 2003?
7    A.  It was early seventies.
8    Q.  Okay. Understanding all of these
9  legal names, all these entities, was it your
10  father or grandfather that purchased that
11  land?
12    A.  My father.
13    Q.  What's his name?
14    A.  Nick.
15    Q.  Nick Filias, okay, all right. So
16  would it be fair to say that that land where
17  the Landing apartments are have been under the
18  control of the Filias Family since the 1970s?
19    A.  Yes.
20    Q.  Okay. Now if you know the answer to
21  the question when the property was first
22  purchased and obviously you probably were a
23  kid at the time, if that. Were the slips
24  there originally or was that something that

Page 23

1  was put in after the purchase if you know?
2    A.  As far as I know there were slips
3  there.
4    Q.  Now based on to the best of your
5  knowledge, Mr. Filias, can you tell me what
6  changes there have been in the structure of
7  those slips and the pier and finger pier that
8  you're able to recount today from personal
9  knowledge and just this very back as far as
10  1970, obviously you were either a kid or not
11  born at the time, but ----
12    A.  Yes, the biggest change was in, I
13  want to say ninety something, '98. We
14  reconfigured the docks to comply with the
15  Chapter 91 license that we acquired.
16    Q.  Okay. So 1998 or so can you explain
17  to me the best you understand it, what that
18  means to have reconfigured the docks to comply
19  with the, you say Chapter 91?
20    A.  Yes.
21    Q.  License, what does that mean?
22    A.  The Chapter 91 license?
23    Q.  Yes.
24    A.  We just registered the boat slips

Page 24

1  with the DEP.  They have their certain
2  requirements to be so many feet from the
3  channel and so on and so forth.
4    Q.  Okay. That's from, is there a Federal
5  channel that runs in there?
6    A.  Yes.
7    Q.  As far as you know?
8    A.  Yes.
9    Q.  So in 1998 was the first time that
10  the piers were registered with the DEP, is
11  that right?
12    A.  Yes.
13    Q.  And in order to I guess, contain this
14  chapter 91 license you needed to comply with
15  their rules and regulations?
16    A.  Yes.
17    Q.  Okay. And that required some
18  reconfiguration of the pier?
19    A.  Yes.
20    Q.  Were you personally involved in the
21  effort to try to bring the dock into
22  compliance for Chapter 91 purposes?
23    A.  In the planning or in the building of
24  the design of it?

Page 25

1    Q.  Well, let's start with planning.
2    A.  No.
3    Q.  Who handled that?
4    A.  I think Hancock started it. Hancock
5  Engineering.
6    Q.  Okay. Where are they out of?
7    A.  I believe they are still out of
8  Danvers.
9    Q.  Okay, and they started it, was there
10  somebody after them?
11    A.  Yes, I'm just trying to think of the
12  firm that we finished up using. I can't
13  remember.
14    Q.  Okay. I mean I notice in some of
15  these drawings, I don't know if this helps you
16  at all, there's a stamp of a David B. Vine?
17    A.  Nucci Vine.
18    Q.  N-U-C-C-I?
19    A.  He designed it.
20    Q.  Okay.
21    A.  And going by whatever guidelines he
22  had to follow.
23    Q.  Okay.
24    A.  I have something to say about the

7 (Pages 22 to 25)

*Exh. "B"*

ALEX FILIAS
July 29, 2005

Page 26

1  design.
2      Q.  Okay.  So you basically if I can
3  understand your testimony, sort of put the
4  project in terms of planning it into the hands
5  of engineers?
6      A.  Yes.
7      Q.  Did the engineering firm also sort of
8  deal with the DEP?
9      A.  They dealt with the Army Corps of
10  Engineers and the DEP.
11      Q.  Do you know where this David Vine, do
12  you know where his office was?
13      A.  I don't.
14      Q.  How was the, can you tell me in a
15  general sense how the pier was reconfigured to
16  bring it in compliance with Chapter 91?
17      A.  What did it look like before?
18      Q.  Yes.
19      A.  It does now?
20      Q.  Yes.
21      A.  It was more straight versus it being
22  arched and following the channel.
23      Q.  Okay.  So did it extend further out
24  in the River bed there and is now, if you

Page 27

1  know?
2      A.  Now or before?
3      Q.  Before.
4      A.  Before I believe it stuck out maybe
5  too close in certain points.
6      Q.  To the Federal channel?
7      A.  As far as I know, yes.
8      Q.  So when was, at some point where you
9  notified or was I guess that would have been
10  Filias Realty Trust notified that permits had
11  been obtained and you could carry out the
12  work, necessary work?
13      A.  When was that?
14      Q.  A bad question.  Let me ask the
15  question again.  At some point was Filias
16  Realty Trust notified that the engineering
17  firm had taken care of things and you could go
18  ahead and carry out the work?
19      A.  Yes.
20      Q.  Okay.  And you know when the work was
21  actually done?
22      A.  I believe in '98 sometime.
23      Q.  What was involved had to be done?
24      A.  As far as the reconfiguration and

Page 28

1  construction wise?
2      Q.  Right.
3      A.  We just built new floats and saved
4  some of the old floats and just reconfigured
5  the new shape of it.
6      Q.  All right.  Well, let me just break
7  it down a little bit.  Let's start inland, the
8  original walk area, did that change or is that
9  the same as it was?
10      A.  I believe it is still in the same
11  line.
12      Q.  In 1998 did the gangway change?
13      A.  No.
14      Q.  Okay.  Did you still use the existing
15  gangway that you had before?
16      A.  Yes.
17      Q.  Now would this have been done in the
18  spring of '98 pre-boating season?
19      A.  I'm not sure.
20      Q.  Okay.  Did you in the wintertime when
21  obviously those slips weren't being used, did
22  you take the floats out, would that be the
23  typical ----
24      A.  Yes.

Page 29

1      Q.  All right.  You have to bear with me
2  because I don't really understand the
3  engineering of some of this.  Right now we're
4  going to talk to you about the pier before the
5  change, just so we can get a general idea.
6      A.  Okay.
7      Q.  About how are those floats secured in
8  place, this is pre 1998, how did you keep the
9  floats where they were supposed to be?
10      A.  With steel pipes.
11      Q.  Exactly how would steel pipes help to
12  hold those in place, just flesh that out for
13  me a little bit?
14      A.  They're just driven into the ground.
15  Then the is a change that goes around the pipe
16  and reconnects to the dock.
17      Q.  The docks themselves obviously they
18  have some kind of floatation devices
19  underneath them?
20      A.  Just old billets.
21      Q.  Basically if I understand it right
22  the steel pipes driven into the ground and
23  then the docks would simply be essentially
24  tied off to those steel pipes, is that right?

8 (Pages 26 to 29)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 30

```
 1    A.  Yes.
 2    Q.  Were there, did you have to moor
 3  them, were there moorings in the standard
 4  sense of heavy objects on the bottom?
 5    A.  No moorings, no.
 6    Q.  Do you know what kind of pipe was
 7  used to do that, to hold those docs in place?
 8    A.  Galvanized pipes.
 9    Q.  Do you know the size of the pipe?
10    A.  Approximately five and a half to six
11  inches.
12    Q.  Were those pipes, and again right now
13  I'm sticking to pre '98 all the changes, we
14  were probably covering a lot of stuff we have
15  to cover elsewhere.  Let's just stick with
16  pre '98 because that gives us a model that we
17  can work from.  At the end of that season
18  would those pipes be taken out or would they
19  be left in the water?
20    A.  No, they were removed.
21    Q.  Do you have any sense or any memory
22  about how many pipes you had to drive in each
23  year and take out each year pre 1998?
24    A.  I don't know the exact count.
```

Page 31

```
 1    Q.  Can you give me a ballpark?
 2    A.  At least a half a dozen.
 3    Q.  Did you have, what was the number of
 4  slips that you had pre 1998, pre the changes
 5  if you know?
 6    A.  I'm not sure.
 7    Q.  Is it more now than it was then, or
 8  do you think it was about the same?
 9    A.  I believe it may be more.
10    Q.  Again pre 1998 do you have any memory
11  as to how many floating sections you actually
12  had as part of that ----
13    A.  No.
14    Q.  Are the floating sections all
15  different sizes or are they standard size?
16    A.  The main walk area?
17    Q.  Well, we can start with that.
18    A.  Those are all the same width.
19    Q.  Okay.  What about, let me just back
20  up.  The main walk area, you talk about the
21  one that goes from the land?
22    A.  Not the structure on the land.
23    Q.  Right.
24    A.  That's separate.
```

Page 32

```
 1    Q.  Okay.  Let's talk about once you're
 2  down the gangway you walk onto, is that what
 3  you're talking about, the main location part
 4  of it?
 5    A.  Yes.  I believe that is what you
 6  asked me.
 7    Q.  That is what I'm asking you.  So that
 8  section that comes off the gangway into the
 9  water?
10    A.  Yes.
11    Q.  Back in 1998 was that one section or
12  was it multiple sections?
13    A.  I believe it was multiple flotation
14  units.
15    Q.  My question is lengthwise are they
16  all standard size or did they vary?
17    A.  I believe so.
18    Q.  And width wise they would have been
19  the same also?
20    A.  Yes.
21    Q.  So again just getting back to the
22  winter approach thing you would take, you
23  would untie the floatation aspects and take
24  those out?
```

Page 33

```
 1    A.  Yes, remove the chains and take the
 2  poles out.
 3    Q.  Take the poles out first and then the
 4  floating dock out afterwards?
 5    A.  Yes.
 6    Q.  Okay.  Did you do that in sections or
 7  did you take all the poles out ----
 8    A.  You do a little bit at a time.
 9    Q.  A little bit at a time, okay.  And
10  how were the steel pipes, what machinery did
11  you, strike the question.  What machinery did
12  you use to get the steel pipes in, first of
13  all?
14    A.  Just merely put in with the sledge
15  hammers.
16    Q.  What about removed, how were they
17  removed?
18    A.  We used scaffolding and a chain
19  hoist.
20    Q.  Would you work, would you guys
21  physically work off of the floating ----
22    A.  Yes.
23    Q.  Part of the dock?
24    A.  Yes.
```

9 (Pages 30 to 33)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

*Exh. "B"*

**ALEX FILIAS**

**July 29, 2005**

| Page 34 | Page 36 |
|---|---|
| 1  Q. Did you yourself actually do that<br>2  work?<br>3  A. Yes.<br>4  Q. Did anybody help you?<br>5  A. Yes.<br>6  Q. Who was that?<br>7  A. Just my employees, whoever was<br>8  working at the time.<br>9  Q. I noticed I think somewhere in the<br>10 answers there's a guy named Marston, does that<br>11 ring a bell?<br>12 A. Yes, that's after '98.<br>13 Q. Okay. That was later on, okay. So<br>14 back in those days pre '98 some employees of I<br>15 take it Filias Construction?<br>16 A. Right.<br>17 Q. That would help you to do that?<br>18 A. Yes.<br>19 Q. How many people did it typically<br>20 take, let's start with putting them in?<br>21 A. Probably three guys.<br>22 Q. What about taking them out?<br>23 A. The same.<br>24 Q. The same, okay, all right. Moving | 1  Q. Okay. Nothing that you were directly<br>2  involved in?<br>3  A. No.<br>4  Q. When you went and took to that<br>5  reconfiguration to comply with Chapter 91, do<br>6  you have a memory of whether the pier was<br>7  already in and you had to set it up or were<br>8  you setting it up from scratch if you follow<br>9  me?<br>10 A. For the very first time of the<br>11 change?<br>12 Q. Yes.<br>13 A. Did we disassemble the old one and<br>14 put the new one in?<br>15 Q. Right.<br>16 A. I doubt that. I think we probably<br>17 started fresh sometime in the month, the<br>18 boating season.<br>19 Q. Right.<br>20 A. To put the new configuration<br>21 together.<br>22 Q. When the new configuration was put<br>23 together, again let me just, again this is<br>24 sort of monotonous stuff that we're doing |

| Page 35 | Page 37 |
|---|---|
| 1  ahead a little bit. Getting back to the work<br>2  that was done in 1998, you told me about the<br>3  engineering companies involved, were there any<br>4  marine architects involved as far as you know<br>5  on the project?<br>6  A. This was after '98?<br>7  Q. No, back to '98 again, sorry.<br>8  A. Okay. Pre '98.<br>9  Q. Right.<br>10 A. Ask me the question again.<br>11 Q. I'm getting back now to the project<br>12 in '98 to conform with 91, Chapter 91. And<br>13 my question is do we know there was an<br>14 engineering, two engineering firms involved?<br>15 A. Yes.<br>16 Q. Let me just ask you this way, any<br>17 other professional consultants that you can<br>18 remember involved in planning and/or execution<br>19 of that?<br>20 A. Not that I can recall.<br>21 Q. Do you know whether any marine<br>22 surveyors were hired in connection with that?<br>23 A. They may have, maybe under the<br>24 engineers who designed the project. | 1  here, so forgive me. But we have to cover it.<br>2  In '98 when you configured the dock I think<br>3  you testified before that you, the land based<br>4  section stayed the same?<br>5  A. Yes.<br>6  Q. Okay. And I think you said that you<br>7  thought that the gangway section was the same<br>8  gangway you had been using?<br>9  A. Yes.<br>10 Q. Okay. Do you have any idea how long<br>11 the gangway was, the original one?<br>12 A. Oh, approximately 20 feet.<br>13 Q. When you reconfigured it to comply<br>14 with Chapter 91, how did you set your bearings<br>15 in terms of making sure you were putting<br>16 things in so that they conformed?<br>17 A. Me personally?<br>18 Q. Yes.<br>19 A. Probably on a plan. I don't have the<br>20 plan here, but there was some ties and<br>21 measurements taken.<br>22 Q. Okay. I mean did you have to take,<br>23 was site work done in the sense of surveying<br>24 and take marks and things like that in order |

**CATUOGNO COURT REPORTING SERVICES**

**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 38

1 to work from?
2    A.  Not me personally.
3    Q.  Do you know if the engineer, and at
4 this point I'm talking about when you were
5 actually carrying out the work.  What I'm
6 trying to get at is like when you're building
7 a house like you do, you take sites and marks,
8 did you have to do that in order to put these
9 in to get them where they are supposed to be?
10    A.  I don't remember.
11    Q.  I don't know if any of these will
12 help you, but you are welcome to look at them.
13 I'll give you, would it help you to look at
14 these to answer your last question?
15    A.  Do you want me to take a look or look
16 at it?
17    Q.  I'll give you what I have and you can
18 just, I'll give you a minute to look at that.
19 There's actually two sets of these.  I'm not
20 sure which is which.  Off the record.
21
22       (Recess taken)
23
24       MR. MCCORMICK: Back on the

Page 39

1 record.
2    Q.  Is there anything in that that helps
3 you ----  Yes.  The measurements here on this
4    A.  Yes.  The measurements here on this
5 particular diagram.
6    Q.  So would this be something that would
7 have aided you in trying to set these in the
8 way ----
9    A.  I'm pretty sure back in '98 when we
10 reconfigured this when we were taking these
11 measurements here to know how to build this.
12    Q.  Okay.
13    A.  Arc.  It really doesn't change much,
14 I don't think, from year to year as far as
15 where it is because these main floatation
16 units I guess it would be a shackle and a pin
17 that would keep the same arc.
18    Q.  These floatation, these little, what
19 we call these finger piers off of the main
20 dock area?
21    A.  Yes.
22    Q.  So those are always head in, you have
23 a specific point that you reattach those two
24 every year?

Page 40

1    A.  Yes, they clip onto the main section
2 in the same place.
3       MR. MCCORMICK: Why don't we mark
4 this as Exhibit 2.
5
6       (Exhibit 2 marked)
7
8    Q.  So these were the sections, Mr.
9 Filias, I'm going to call, I don't know if it
10 is the right terminology, but I'm going to
11 call them finger piers off the main pier.
12    A.  That's what I call them.
13    Q.  Okay.  All right.  So we each have
14 the same terminology.  Those attached to the
15 main pier in the specific places each year, is
16 that right?
17    A.  Yes.
18    Q.  How do, I have seen it, but I'm just
19 trying to remember now, how does the boat
20 owner get their boat into their particular
21 slip under this configuration, in other words
22 how do they access it?  Do they come around to
23 the inside of that, is that how it works, the
24 entrance around the inside, right?

Page 41

1    A.  Well, this is the river here, right.
2    Q.  Okay.
3    A.  So just pull in right to this, pull
4 in.
5    Q.  Okay.
6    A.  They come right in here.
7    Q.  This diagram that we're looking at,
8 Exhibit 2, is this to the best of your
9 understanding, does this show the realignment,
10 the 1998 realignment that we have been talking
11 about the plan for that?
12    A.  This plan is the '98 realignment,
13 yes.
14    Q.  Do you have any idea how many feet
15 closer to shore this alignment put your
16 furthest point into the river as opposed to
17 how it was before the realignment?
18       MR. KIESLING: Objection.
19    Q.  Do you understand the question?
20    A.  I wouldn't know that.
21    Q.  Okay.  Do you understand the
22 question?
23    A.  Yes.
24    Q.  All right.  Let's see here.  And

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

ALEX FILIAS
July 29, 2005

---

**Page 42**

1  again in terms of this reconfiguration in 1998
2  do you and some workers at Filias Construction
3  actually carried out the work, is that right?
4     A.  Yes.
5     Q.  Do you have to hire any
6  subcontractors to do any of that work?
7     A.  No.
8     Q.  Was any dredging involved at that
9  point?
10     A.  No.
11     Q.  Do you know if you were, did you make
12  any as far as you know, did you or your
13  engineering companies make any requests to
14  dredge at all in the area of this where the
15  slips were to be?
16     A.  That was part of the permit to at
17  some point to do dredging, but due to costs we
18  never ended up removing any materials at this
19  point.
20     Q.  So as far as you understand the
21  permit that permitted you to do some dredging
22  within a certain time frame, I guess?
23     A.  Yes.
24     Q.  Okay.  And where if you understand

---

**Page 43**

1  if you have an understanding as to, do you
2  know what the area you had permission to carry
3  out dredging work?
4     A.  Obviously around the floatation
5  units, but it was probably a line on there
6  somewhere where it would show the dredging
7  line.
8     Q.  It would have to be in the area of
9  the dock though, obviously they wouldn't want
10  you going way out to the river and ----
11     A.  Right.  That would be in the area of
12  the floatation.
13     Q.  Originally in 1998 when you
14  reconfigured the dock, how were these docks,
15  how would the dock and pier and slips held in
16  place?
17     A.  This is pre '98?
18     Q.  Well, actually after the
19  reconfiguration in 1998, the first thing with
20  this new configuration, how did you hold them
21  in?
22     A.  Still with the galvanized pipes.
23     Q.  So as far as securing the dock is
24  concerned is the same system as you had before

---

**Page 44**

1  '98; is that correct?
2     A.  Yes.
3     Q.  So you would go out in the spring and
4  drive the steel pipes in and attach the dock
5  to the steel pipes?
6     A.  Yes.
7     Q.  Do you know, do you have any memory
8  as to whether you needed more steel pipes
9  under the new reconfiguration, or if it was
10  the same amount?
11     A.  It was probably the same.
12     Q.  Now how, what was the length of those
13  steel pipes if you remember, and I asked you
14  and I think you gave me an estimate of the
15  diameter.  Do you have any idea about how long
16  those were?
17     A.  Oh, I would say at least 20 feet.
18     Q.  Do you know how far down you had to
19  get them into the riverbed to make these
20  secure?
21     A.  We used to get them probably five to
22  six feet.
23     Q.  Do they have with the bottom of the
24  piping just flat or was there built like it

---

**Page 45**

1  had a wedge in it so it would go in?
2     A.  They were just straight across flat.
3     Q.  Okay.  And is this diagram #2
4  understanding, I understand in 2003 there was
5  some more changes particularly how these were
6  secured, but does diagram two essentially show
7  the layout as it exists today of the slips?
8     A.  Yes.
9     Q.  And the peer?
10     A.  Yes.
11     Q.  Looking at this diagram, can you tell
12  me how many active slips you have today for
13  boats?
14     A.  I think what I said maybe 16 slips or
15  so.
16     Q.  Two between each of these fingers?
17     A.  That's right.
18     Q.  And one on each end?
19     A.  Yes.
20     Q.  Okay.  And then is there a spot for a
21  vessel or two on the inside?
22     A.  There is.
23     Q.  Do you just for your sake of knowing,
24  do you remember these slips in any way?

---

12  (Pages 42 to 45)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

Exh. "B"

**ALEX FILIAS**
**July 29, 2005**

Page 46

1    A. I believe there's some tags on the
2  fingers.
3    Q. Okay. Do you know if, do you know
4  for instance where #1 would be in our picture
5  here?
6    A. Right here.
7    Q. Okay. Can you just put a little
8  black mark here, that would be #1, do you know
9  if they go two, three, four, all the way down
10 towards the end?
11   A. Yes.
12   Q. Once the reconfiguration was
13 completed in 1998 or so, were all of the slips
14 full water slips or were there some mud and
15 some full water?
16      MR. KIESLING: Pre '98?
17   Q. No, I'm finally moving ahead, here.
18 After the reconfiguration in 1998 were they
19 all full water or some of them mud slips?
20   A. I would say probably most of them
21 were water slips.
22   Q. Do you understand when I used the
23 terminology water slips as opposed to mud
24 slips is what I'm referring to?

Page 47

1    A. If you want to explain to me you
2  could.
3    Q. Well, my question would be whether
4  all of the slips even at the lowest tide in
5  the Essex River had sufficient water for the
6  vessels to just get in or get out of the slip?
7    A. And you're saying at the lowest tide?
8    Q. The lowest tide, absolute lowest
9  tide?
10   A. I think you would have probably maybe
11 50 to 70% of it being mud at that time maybe.
12   Q. Has that changed over the years?
13   A. I think it can. I don't monitor that
14 exactly. I don't go out there with any
15 measuring devices to measure the settling of
16 the marsh.
17   Q. Okay. Well, let me ask you this way.
18 I'm now taking you to the present day. When
19 Filias and the Filias Trust, the 138 Main
20 Street Trust leases these slips to boat
21 owners, do you lease them as, is there a
22 differentiation between a full water slip and
23 mud slips?
24   A. As far as cost is concerned?

Page 48

1    Q. Yes.
2    A. You'd have to call the office for
3  that. I don't have that information.
4    Q. So you don't know today whether
5  somebody is getting a mud slip, what I'm
6  calling a mud slip which is I think is some
7  sort of a term of art in the Essex River
8  anyway, would pay less money than somebody in
9  a full water slip?
10   A. Again I don't know the difference if
11 there is one.
12   Q. Okay. And who handles the cost and
13 the charging of the people for boat slips?
14   A. Paula Filias.
15   Q. Is Paula related to you?
16   A. That's my wife.
17   Q. All right. But in any event back in
18 1998 I think your testimony was that at dead
19 low tide not all of these slips would have
20 full access in and out, is that fair to say?
21   A. At dead low?
22   Q. At dead low.
23   A. Could you get your boat in there? I
24 would say I think it would depend on the

Page 49

1  person's ability to drive in their boat.
2    Q. All right. Today I'm jumping back
3  and forth, but today are there times when
4  somebody's boat would literally be at low
5  tide, be literally sitting on mud in one of
6  these, some of these slips?
7    A. A portion of it or the whole thing?
8    Q. A portion of it.
9    A. I think a portion of it, sure.
10   Q. Moving right along, the pilings that
11 you are working with both pre and post '98
12 were they the same pilings as far as you know?
13   A. Would you say that again?
14   Q. Sure. When you reconfigured, did you
15 buy new pilings or did you just use the ones
16 you had?
17   A. I don't recall.
18   Q. Okay. Do you know if you did buy new
19 pilings, do you know where your purchased
20 those from?
21   A. No.
22   Q. All right. Now following the
23 realignment in 1998 did you continue to use
24 the same system of securing the dock for a

13 (Pages 46 to 49)

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 50

1  period of time, meaning using pilings to
2  secure the dock for some period of years after
3  1998?
4      A.  Yes.
5      Q.  Okay.  Did you change that at some
6  point the way that you secured the pier?
7      A.  With another type of piling?
8      Q.  Right.
9      A.  Yes.  We went to the wood pilings.
10     Q.  By the way, during this realignment
11 work in 1998 are you aware of anybody taking
12 any, did you take any pictures of the dock as
13 it was going along, or anybody else that you
14 know of take any pictures?
15     A.  None that I can remember.
16     Q.  Do you know whether the engineers
17 ever had to have somebody come out to do an as
18 built once the thing was in place in order to
19 assure the federal government that it was in
20 compliance?
21     A.  I don't know that either.
22     Q.  By the end of the job am I correct in
23 saying that David Vine was the guy who was the
24 engineer?

Page 51

1      A.  Yes.
2      Q.  Why did you change engineering firms?
3      A.  We just weren't happy with the firm
4  that we selected originally.
5      Q.  How long in the first year 1998, how
6  long did it take you to put this in, you and
7  your men, was it a day job, was it a week job?
8      A.  The first time we put it in?
9      Q.  Yes.
10     A.  Physically to construct the new piers
11 and whether they had to be changes or, I'm not
12 sure what you specifically you mean.
13     Q.  Well, let's back up.  Did you have to
14 buy new dock sections to do this or did you
15 construct the dock sections?  Let me ask you a
16 new question.
17     A.  Okay.
18     Q.  In 1998 you changed the pier
19 configuration.  Did you need new dock
20 sections at that time?
21     A.  Some we were able to salvage from the
22 old configuration and some we replaced them
23 with new.
24     Q.  Did you build those or did you buy

Page 52

1  dock sections?
2      A.  We built them.
3      Q.  Built them, okay.  So that is what
4  I'm getting at, your question.  So let me just
5  take the aspect of once the dock sections were
6  all set and everything, how long did it take
7  you actually put it in?
8      A.  Into the water and set it up?
9      Q.  Yes.
10     A.  I don't think it takes usually more
11 than a day.
12     Q.  That is the same from 1998 until you
13 changed the pilings, and maybe even know I'm
14 just going to take '98.  During the time that
15 you were using the metal pilings were they
16 pretty much the same amount of time every year
17 to put that in?
18     A.  About, I would say yes.  The day
19 might be broken up.
20     Q.  Okay.
21     A.  It could be you know a few, if you're
22 saying the day is eight hours then it was
23 probably.
24     Q.  During the years, was it 2003 it

Page 53

1  changed over the wood pilings?
2      A.  I believe so.
3      Q.  Okay.  So is it during the years that
4  you were putting in and taking out metal
5  pilings every year, putting them in in he
6  spring and taking them out in the fall, did
7  you ever come across any existing piling
8  structures in the river bed in and around the
9  dock?
10     A.  After '98?
11     Q.  Between '98 and '03.
12     A.  Did we remove any debris?  In '03
13 when we had the wood pilings put in.
14     Q.  Yes.
15     A.  There may have been some debris in
16 here that we had taken out.
17     Q.  Okay.
18     A.  Somewhere in this portion of the ----
19     Q.  Can you, why don't you draw a circle
20 around that, just so that when we look at this
21 later on we'll know where you're talking
22 about?
23     A.  Probably mid section, somewhere in
24 here.

14  (Pages 50 to 53)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

---

Page 54

1    Q.  Okay.  So where you have drawn this
2  circle?  I'm just going to darken that, if
3  that is okay.  What kind of debris did you
4  find in there, Mr. Filias, in the course of
5  that project?
6    A.  I think there was a lobster trap and
7  a bench chair and rope.  I was just trying to
8  think here.  Let me think about that.
9    Q.  Okay.  When, and if you think about
10  anything else, let me know that you remember
11  pulling out of there.  My question is this.
12  Well, let's say at any time from the date that
13  you personally became involved in working in
14  conjunction with this pier structure, up to
15  the time that Ted Marshall had a problem with
16  is boat, was there ever an occasion where
17  either taking in, taking piers in or putting
18  them out or any other work in this area did
19  you ever come across any submerged piling
20  structures?
21    A.  Back to answer your last question,
22  that was what I was thinking of here.  I just
23  can't remember if I pulled up any old pipe or
24  not here.

---

Page 55

1    Q.  In the area where you have drawn the
2  circle?
3    A.  Yes.
4    Q.  Was anybody with you when that work
5  was being done?
6    A.  The fellow that put in the wood
7  pilings.
8    Q.  Who was that, Mr. Marston?
9    A.  Yes.
10    Q.  So as you sit here today you don't
11  remember clearly whether you did or did not
12  pull out any pile, any metal pilings out of
13  the area that you circled back in 2003?
14    A.  Right.  I just want to think clearly
15  and make sure of that ----
16    Q.  Okay.  Well, why don't we move ahead.
17  If something comes to mind, you know, just
18  stop me and go back to this, okay?
19    A.  H'm-h'm.
20    Q.  Okay.  Why don't we move it to 2003.
21  That is the next time any kind of work was
22  really, other than routine maintenance, that
23  real changes in the dock and the way that it
24  is secured were made right in 2003?

---

Page 56

1    A.  Right.
2    Q.  Okay.  And if I understand correctly
3  what happened that time was you moved away
4  from the metal piling system and put wood
5  pilings in; is that correct?
6    A.  Right.
7    Q.  What precipitated that action?
8    A.  From the steal to wood?
9    Q.  Yes.
10    A.  Because we were registered with the
11  DEP, so many pilings to be permanently put in
12  place.  So instead of taking them all out we
13  could leave the wood ones in every year.
14    Q.  I see.  So going back to 1998 permit
15  that allows you to put permanent pilings in?
16    A.  Yes.
17    Q.  So in 2003 you took that step to do
18  that?
19    A.  Right.
20    Q.  That would allow you not to have to
21  go through the process every year of taking
22  them in and putting them ----
23    A.  Right.
24    Q.  Putting them in and taking them out?

---

Page 57

1    A.  Right.
2    Q.  Okay.  And as far as that part the
3  job goes, you have to go through a whole other
4  set of engineering issues or anything like
5  that, or was that just simply a matter of
6  doing the work?
7    A.  We're talking about the pilings?
8    Q.  Yes, 2003.
9    A.  It was yes, just doing the work.
10    Q.  Okay.
11    A.  We had the coordinates.
12    Q.  Who did that work?
13    A.  Marston.
14    Q.  Were you working with him personally
15  on that part or did he just handle driving,
16  getting those pilings in for you?
17    A.  I hired him and I did check up on
18  him.
19    Q.  How did you find Mr. Marston, did he
20  come recommended to you from somebody or ----
21    A.  Yes, that I knew someone that could
22  do it, I gave him a call, it was just a matter
23  of lining it up with him.
24    Q.  Did you have any written contract

15  (Pages 54 to 57)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 58

```
 1   with him?
 2       A.  I don't think so.
 3       Q.  Okay.  Just sort of a verbal
 4   agreement?
 5       A.  Yes.
 6       Q.  How did he drive the pilings?
 7       A.  He had just like a little barge thing
 8   with a crane.
 9       Q.  And if you know, how did he know
10   where to put the pilings?
11       A.  You're asking me did he know where to
12   put them?
13       Q.  Yes.  Well, let me ask the question a
14   different way.  Was he, how was he, what
15   information was he given as to where he should
16   place the pilings?
17       A.  Well, I already had the dock set up
18   and he just put the pilings next to the peer.
19       Q.  So when he did it the dock was
20   already in the water?
21       A.  H'm-h'm.
22       Q.  Okay, yes?
23       A.  Yes.
24       Q.  How many pilings did he put in?
```

Page 59

```
 1       A.  Five or six.
 2       Q.  If I understand the operation
 3   correctly once you have these wooden pilings
 4   driven, each year you bring your floatation
 5   and then tie them off in permanent pilings, is
 6   that right?  Let me ask the question another
 7   way.
 8       A.  Yes.
 9       Q.  You have permanent pilings there?
10       A.  Yes.
11       Q.  So every year when you put the
12   floatation devices in the dock itself and tie
13   it off in these permanent pilings, is that
14   right?
15       A.  We tie it off?
16       Q.  You tie the dock sections off to the
17   permanent pilings?
18       A.  In the winter?
19       Q.  No, I the summer.
20       A.  In the summer, yes, they are chained
21   to the docks.
22       Q.  Just like you used to do with the
23   metal poles, except now you have the wooden
24   poles to go with it?
```

Page 60

```
 1       A.  Right.
 2       Q.  They hold those in place, they hold
 3   the dock sections in place?
 4       A.  Right.
 5       Q.  Okay.  And do you remember how long
 6   it took him to get those in?
 7       A.  Maybe a day.
 8       Q.  Were you out there with him when he
 9   was working that day, I mean physically on
10   site?
11       A.  I'm sure I was in and out.
12       Q.  All right.  Now when you think you
13   had some question you remember finding some
14   kind of debris in the slip or whatever it is,
15   I'm going to say one, two, three, five, six,
16   maybe eight, nine area.  Do you remember at
17   least how it came about that you came upon
18   this debris in that section that you circled?
19       A.  Because we were working there.  We
20   did come up on a low tide was I was able to
21   see that there was some, you know, debris
22   there.  I just took care of it.
23       Q.  Again you know, I'm not going to beat
24   a dead horse, but as you sit here I'll just
```

Page 61

```
 1   ask you one more time.  Today you can't
 2   remember whether you saw any existing pilings
 3   popping up through that section?
 4       A.  I can't say I can remember exactly
 5   what we pulled out of there, but it was
 6   definitely debris.  It could potentially you
 7   know, damage someone's boat.
 8       Q.  Was Mr. Marston with you when you
 9   came upon this debris?
10       A.  Yes.
11       Q.  Well, if it was a submerged piling
12   and I understand you're clear whether it was,
13   that would be more than just having to jump
14   down in there and getting a beach chair out of
15   there, right.  Wouldn't you have to hoist that
16   out in some way?
17       A.  This right here where we found the
18   debris?
19       Q.  Yes.
20       A.  Yes.  I mean it was hear putting the
21   pilings and we pulled the stuff out with his
22   equipment.
23       Q.  Okay.  And was that stuff, was it
24   laying on top or was it partially submerged,
```

`16 (Pages 58 to 61)`

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 62

1  embedded in?
2    A.  I think both.
3    Q.  That's the only location you found
4  any debris during the course of that job Mr.
5  Filias?
6    A.  After that we took a real careful
7  look to make sure that there was nothing else
8  before he had left to go to make sure that we
9  didn't need help removing anything else.
10    Q.  I see, okay.  When this work was
11  done, was any dredging done in and around the
12  area of ----
13    A.  No.
14    Q.  Have you ever done any of the
15  dredging that permit allowed you to do
16  any of these ----
17    A.  Not to this point.
18    Q.  As far as you know he is still would
19  legally be able to do that under the permit,
20  if you know?
21    A.  I would have to talk to the people
22  about that.
23    Q.  Had you ever looked into the cost of
24  dredging those slips?

Page 63

1    A.  At one time many years ago.
2    Q.  Okay.
3    A.  It was cost prohibitive.
4    Q.  Okay.  So it's a very expensive
5  undertaking?
6    A.  Yes, very expensive.
7    Q.  Because you have to dredge it and
8  then you have to dispose of the material,
9  right, in some proper way?
10    A.  Yes.  We had all the permits to dump
11  it out to sea.
12    Q.  Again with respect to the 2003, you
13  know, just the replacement of the pilings you
14  know, you didn't have to do any as built plans
15  or any engineering shoots out there after that
16  work was done, did you?
17    A.  I don't recall.
18    Q.  Okay.  2003 when you put the new
19  pilings in did you make any other changes to
20  the pier or access there to the gangway or
21  anything like that change?
22    A.  2003, explain the question again?
23    Q.  Sure.  When you did the work in 2003
24  you put the new wood pilings ----

Page 64

1    A.  For the first time?
2    Q.  Yes.
3    A.  For the first time that these were
4  in?
5    Q.  Yes.
6    A.  I still don't understand the
7  question.
8    Q.  When you changed the pilings and I
9  think you indicated it was already in for the
10  year already, so I'm sort of doubting you
11  changed anything else at that point, but I
12  just want to be clear, you didn't change
13  anything having to do with the dock itself,
14  change the configuration, change the
15  locations, floating dock sections, change the
16  gangway or anything like that?
17    A.  Not that I can remember.
18    Q.  Okay.
19    A.  Maybe make the chains a little bit
20  larger to go around the larger pilings, that
21  seems kind of ridiculous to even.
22    Q.  Right.
23    A.  I'm not talking about that.
24    Q.  Okay.  And after you put the new

Page 65

1  pilings the wood pilings, did those ever have
2  to be redriven, did you ever have to make any
3  changes since they were originally put in in
4  2003 or are they exactly the same pilings in
5  the same places that they were when they were
6  originally put in in 2003?
7    A.  Yes.  We had to redrive them.
8    Q.  When was that done?
9    A.  '04.
10    Q.  Okay, and why?
11    A.  Ice removal.
12    Q.  So they physically came out of ----
13    A.  I think they all had came out.  I
14  can't remember exactly if they did.
15    Q.  All right.  That was caused by the
16  river freezing?
17    A.  Yes.
18    Q.  So did you have to get Mr. Marston
19  back after 2004 to redrive them?
20    A.  Let's see, '03 that goes into '04, I
21  would say yes.
22    Q.  Did you, were you, did you, were you
23  mad at Mr. Marston, did you think that he had
24  done anything wrong that he hadn't done it

17  (Pages 62 to 65)

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 66

1  properly that they didn't stay in place?
2      A.  No.
3      Q.  Let me show you another document that
4  was in the package, it was given to me Mr.
5  Filias and ask you to just take a look at that
6  for me?
7      A.  This is a cross section, yes.
8      Q.  Do you recognize this?
9      A.  It is not one what I would refer to a
10 lot.
11     Q.  Do you understand that this was maybe
12 something that Mr. Vine did in connection with
13 the, probably the 1998 project?
14     A.  I would say he did, yes.
15     Q.  And just, I'll just on this one it
16 indicates a 25 foot gangway.  Is that the size
17 of the gangway that you had in 1998?
18     A.  Pre '98?
19     Q.  Well, let's start with pre '98.
20     A.  It was a wood gangway.
21     Q.  When you changed it in '98 did you
22 convert to an aluminum gangway?
23     A.  No.
24     Q.  It was still the same one?

Page 67

1      A.  Yes.
2      Q.  I'm just saying, all I'm pointing at
3  is this drawing which apparently was in
4  connection with the '98 project showing a 25
5  foot gangway.  Does that comport with your
6  memory of the size of that gangway?
7      A.  No, I would never measure it because
8  it was always the same one we used.  I don't
9  have a reason to measure it because it
10 always hits in the same point every year.
11     Q.  Okay.  Was this gangway ever
12 replaced?
13     A.  We replaced the gangway, I think this
14 would be, I think the second summer we have
15 had it.  So what's that, we bought the gangway
16 last year.
17     Q.  Okay.  2004?
18     A.  Yes.
19         MR. MCCORMICK:  By the way Tom,
20 we should probably mark this since we talked
21 about it, as Exhibit 3, the cross section that
22 I was just asking the witness about.
23
24         (Exhibit 3 marked)

Page 68

1      Q.  Okay.  I just want to take a quick
2  step back, and I know I'm all over the place,
3  I'm doing the best I can.  Back to when you
4  found that debris that we talked about and it
5  is identified in one of our exhibits.  I don't
6  know where it is.  But anyway ----
7          MR. KIESLING:  Exhibit 2.
8      Q.  Exhibit 2.  I just want to be clear
9  on the testimony.  After you found that is it
10 your testimony that you visually inspected all
11 the other slips for similar debris?
12     A.  Yes.
13     Q.  Did you do any other, take any other
14 steps to ascertain whether or not there was
15 any debris in those other slips other than
16 making a visual inspection?
17     A.  No.
18     Q.  All right.  So where were we?  Okay.
19 We were talking about the gangway I think in
20 2004, the spring of 2004 you changed gangways
21 Mr. Filias?
22     A.  Yes.
23     Q.  That was from the old, I guess,
24 wooden gangway to a new one?

Page 69

1      A.  Yes.
2      Q.  The other gangway was one you had
3  there for years and years, right?
4      A.  Yes.
5      Q.  Do you know whether the new gangway
6  was the same size as the old gangway?
7      A.  Approximately the same size, maybe a
8  tiny bit wider.
9      Q.  Okay.  But you don't know if it was
10 any shorter than the old gangway?
11     A.  I don't recall it being shorter, no.
12     Q.  I notice in the request for
13 production, I notice in the permit that you
14 folks got back I guess in '98 due to that
15 original '91 compliance that it states that it
16 gives you permission to install and maintain a
17 single 35 foot gangway.  Do you have any
18 knowledge as to why this called for a 35 foot
19 gangway?
20     A.  What is the date on this?
21     Q.  It says complete by 2001, but let me
22 just see if I can find you a date.  It looks
23 like the Department of Army Permit, the first
24 page, top right corner maybe 3/20/97 it looks

18 (Pages 66 to 69)

*Exh. "B"*

ALEX FILIAS
July 29, 2005

Page 70

1  like it was recorded somewhere, maybe the
2  registry of deeds. I'm not sure, but right up
3  here is Mr. Filias.
4      A.  Okay.
5          MR. McCORMICK:  Take your
6  time and take a look at that. That was
7  produced to me through your attorney. Let's
8  go off.
9
10         (Off record)
11
12         MR. McCORMICK: Let's go back on
13  the record.
14     Q.  Mr. Filias, I just showed you a
15  Department of Army permit. Did you, and I
16  think you just off the record you told me that
17  you're not sure what this document is?
18     A.  I know what it is, but I'm not sure
19  what the measurements pertain to as far as
20  what we have, because it explains, it lists
21  here four by twenty floats curving, four
22  twenty foot floats curving out in an
23  east/north direction. So that explains it
24  would have to be curved, I guess.

Page 71

1      Q.  I think they're talking about the
2  property that you walk on flat perhaps?
3      A.  Yes.
4      Q.  Okay. So you're not clear?
5      A.  I'm not.
6      Q.  On how the description applies to
7  what actually that would be this?
8      A.  I'm not sure.
9          MR. McCORMICK: Why don't we just
10  mark this, just to be sure. Some of these are
11  altogether it's going to be one, two separate
12  that at the end Jeff. I'm going to say that
13  the permit may have attachments. I'm not
14  clear on that, but the actual document that I
15  talked about with Mr. Filias appears to be
16  four pages. And interestingly the second page
17  is marked four in this, and I have no idea why
18  that is. But this is a four page document.
19  Mark that as well.
20
21         (Exhibit 4 marked)
22
23     Q.  Now moving right along, okay. We
24  talked about the new gangway being put in

Page 72

1  2004. Why did you change gangways?
2      A.  The old wooden one needed to be
3  replaced.
4      Q.  Did you change anything else at the
5  time that you changed the gangway in 2004 with
6  respect to the pier structure?
7      A.  No.
8      Q.  The existing land part of this. Let
9  me go back to at least for the sake of
10  illustration the existing timber pier I think
11  they called it, has that stayed the same
12  throughout?
13     A.  Are you pointing to ----
14     Q.  This section right here, what they
15  call the existing structure in this plan?
16     A.  I would say yes.
17     Q.  Then even before '98 that is the same
18  structure?
19     A.  Yes, it has been pretty much the
20  straight line and just maintained changing
21  wood decking and so forth.
22     Q.  So that has been the same throughout?
23     A.  And we changed the gangway as of
24  2004.

Page 73

1      Q.  Okay. From 1998 when you
2  reconfigured the dock up to the present, let
3  me back up. Do you occasionally go out during
4  the summer and just sort of check on things?
5      A.  I do.
6      Q.  During the five year period 1988
7  throughout, we'll say six years, 1998 through
8  2004, did you notice any changes in the water
9  depths in the slips, I mean obviously
10  recognizing that there's high tide and low
11  tide, but I'm just saying let's take a dead
12  low, have you noticed any progression or
13  changes in the water depths in your slips over
14  that time period?
15     A.  I believe that it does change from
16  year to year.
17     Q.  Okay.
18     A.  How much, I don't know. It is
19  something that I don't measure either.
20     Q.  Is it going in one direction, meaning
21  are you getting less and less water each year
22  in the slips, or are you saying that some
23  years there's more and some years there's
24  less?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 74

1    A.  I don't know.
2    Q.  So you're not noticing any pattern
3  there?
4    A.  No, there was not something that I
5  really keep a record of either.
6    Q.  Have you had any complaints, do you
7  have any complaints from lessees from 1998 to
8  2004 about their slips not having the kind of
9  water that they had in previous years?
10    A.  I wouldn't receive that type of call.
11    Q.  That would be Paula?
12    A.  That would be an office call.
13    Q.  Your wife probably or somebody else
14  at the office?
15    A.  Paula would probably be the one that
16  would receive a call like that.
17    Q.  Again I mean you've said this many
18  times, we might just as well put it on the
19  record, you haven't hired any marine surveyors
20  from 1998 to 2004 to try to establish what the
21  water levels are or any trends in the water
22  levels in the slips during that time frame?
23    A.  To monitor the different changes from
24  year to year?

Page 75

1    Q.  Yes.
2    A.  No.
3    Q.  All right.  Let me talk to you a
4  little bit about Mr. Marshall.  I'm getting
5  the sense that some of this may fall more
6  under your wife's certain knowledge than
7  yours, but if that's the case just let me
8  know, okay?
9    A.  H'm-h'm.
10    Q.  Do you know how long Mr. Marshall was
11  renting a slip from the trust?
12    A.  I don't know the exact amount of
13  years.  But it has been at least a half dozen
14  years I would say.
15    Q.  Do you have any knowledge as to how
16  the circumstances were, let's go off for a
17  second.
18
19        (Off record)
20
21        MR. MCCORMICK:  Back on the
22  record.
23    Q.  Do you know what the circumstances
24  were that led Ted Marshall and Filias Realty

Page 76

1  Trust to come together as a lessee and lessor
2  of that slip?
3    A.  He probably needed a boat slip.
4    Q.  In other words you don't know if he
5  called you or ----
6    A.  I don't know.
7    Q.  How that came about.  Did you ever,
8  has Filias either the real estate trust or the
9  138 Main Street Trust, did you ever advertize
10  these slips?
11    A.  I don't know.
12    Q.  So if you don't know what the
13  original relationship began, let me strike the
14  question.  Do you remember whether Ted
15  Marshall talked to you originally about the
16  slip or somebody in your office, if you know?
17    A.  I don't know.
18    Q.  How were the slips rented out, how
19  was the amount of money again if you know, Mr.
20  Filias, determined as to what somebody pays
21  for a slip, and I'm talking, let's just take
22  today as a benchmark.  What do you charge
23  somebody?
24    A.  I think it is done by the length of

Page 77

1  the boat.
2    Q.  So each foot of the boat is a certain
3  amount of dollars per season?
4    A.  Yes, I believe that is how it is
5  handled.
6    Q.  Is there a certain maximum length
7  these slips will handle?
8    A.  It probably is, but we have never
9  really have had an issue with that.
10    Q.  Do you know whether when Mr. Marshall
11  came to Filias about whether there was some
12  understanding about at that time as to ties and type
13  of boat that he would be using in that slip?
14    A.  I imagine that discussion had to have
15  been made to size the slip in order to know
16  what to charge him to make sure that the boat
17  could fit properly.
18    Q.  Do you know as we sit here today what
19  type of boats Mr. Marshall, boat or boats
20  would use that slip for?
21    A.  What the make of the boat is?
22    Q.  No, I'm sorry, just a general
23  description.
24    A.  He has a pontoon boat, he has a

20  (Pages 74 to 77)

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 78

1 little motor boat. He has the boat that you
2 know had the damage to it which was like I
3 guess a cruising boat of some sort.
4    Q. Would he have the right again if this
5 is within your preview to use his slip for any
6 of those three boats ----
7    A. Can you say, the question again?
8    Q. Sure. Would he have the right, as
9 you understand it, vis-a-vis your, Filias
10 understanding with Marshall regarding the
11 lease?
12    A. Right.
13    Q. Could he use that slip for any of his
14 three boats?
15    A. That would probably be a better
16 question for Paula.
17    Q. Have there been times, were there
18 times prior to 2004 when his vessel sustained
19 the damage that you were down when you saw Mr.
20 Marshall's boat, boat or boats in the slip, in
21 slip #1?
22    A. I'm sorry, say that one more time?
23    Q. Did you over the years, did you see
24 Ted Marshall's boat or boats in his slip?

Page 79

1    A. Yes.
2    Q. Was there ever a time when you felt
3 that the boat or boats that you saw in that
4 slip were not appropriate for the slip?
5    A. I don't think I would say that.
6    Q. Just to be clear, is it, am I correct
7 in saying that he has been renting since the
8 beginning slip #1?
9    A. As far as I can remember.
10    Q. All right. And that is the one that
11 you have actually marked the one on the
12 diagram?
13    A. Yes.
14    Q. So that's Ted Marshall's slip right
15 there with #1?
16    A. Yes.
17    Q. Besides the length of the boat which
18 is calculated into the price of the slip, do
19 you know whether your office inquires as to
20 the, what a vessel draws how deep it extends
21 below the low water line?
22    A. Did we ask that question to the boat
23 owner?
24    Q. Yes, before you rent the slip?

Page 80

1    A. I don't know.
2    Q. What about the width of the boat, is
3 that something that you inquire into?
4    A. I believe that is taken into
5 consideration.
6    Q. Because you want to make sure at
7 least the interior slips have additional room
8 for two boats, right?
9    A. Right, I would say exactly it, yes.
10    Q. Do you know whether Filias was aware,
11 and again you're hear as sort of the
12 representative of the trust, so if you know
13 the answer fine, if you don't just let me
14 know. But you're aware that Mr. Marshall was
15 using his boats for commercial purposes, not
16 just recreational?
17    A. Yes. I believe we know that.
18    Q. At the time that Mr. Marshall first
19 rented the slip from Filias in '67 or whatever
20 how many years ago was it, the belief of
21 Filias, if you know, that the slip he was
22 renting could reasonably and safely
23 accommodate his boat?
24    A. As far as I know?

Page 81

1    Q. Do you know whether anybody from
2 Filias told him or represented to him that
3 that slip would safely and reasonably
4 accommodate his boat?
5    A. I believe so.
6    Q. Again you answered this a little bit
7 before. And if you don't know, you know, we
8 need to ask your wife when the time comes, but
9 do you know whether that slip was rented as a
10 "wet slip", a full water slip?
11    A. I don't know that.
12    Q. You're not sure again just to
13 reiterate whether Filias differentiates
14 between mud slips and wet slips in terms of
15 cost, right?
16    A. I don't know.
17    Q. That's something that Paula may know?
18    A. I would say yes.
19    Q. I want to ask you a little bit about
20 what rights the, well, first of all there's
21 no, let me do it this way. As far as you know
22 and this may not be within your preview,
23 Mr. Filias, but every year, let me show you a
24 document. Look at that. I'll ask you to look

21 (Pages 78 to 81)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 82

1  at that document and identify that document?
2    A.  It looks like Ted Marshall's lease.
3    Q.  Okay.
4    A.  For '04.
5    Q.  For '04.  Would this be the type of
6  form that, if you know, that your office would
7  typically generate each year to renew?
8    A.  I can't answer that.
9      MR. MCCORMICK: Can we mark that,
10 please.
11
12      (Exhibit 5 marked)
13
14    Q.  Is this something again the office
15 would handle rather than you?
16    A.  Yes.
17    Q.  In terms of paperwork?
18    A.  Yes.
19    Q.  It looks like again on this that
20 there is an indication of price per foot which
21 looks like $90 per foot?
22    A.  Yes.
23    Q.  Okay.  For a total of 2160 it appears
24 for that season, is that right?

Page 83

1    A.  Yes, I would say yes.
2    Q.  Now my question is this, and if you
3  know just let me know.  If you don't, let me
4  know.  Other than this form, the two documents
5  here, other than this form are you aware of
6  any other written document pertaining to Mr.
7  Marshall's lease of that slip from Filias?
8    A.  I'm not aware of it.
9    Q.  Is there any written contract that
10 spells out, specifically spells out all the
11 duties and obligations of each party with
12 respect to that lease?
13    A.  No.
14    Q.  So let me ask you then if you have an
15 understanding of this, your general
16 understanding of the agreement between you and
17 Mr. Marshall with respect to the slip.  If you
18 have an understanding one way or the other, if
19 you don't just tell me, okay, on several
20 points.  Under your agreement with Mr.
21 Marshall do you know whether Filias retained
22 the right to move or retie his vessel if
23 necessary for some reason?
24    A.  I'm not sure.

Page 84

1    Q.  What about, do you know whether if
2  you had the right to pump his vessel out if he
3  was in distress or sinking or anything of that
4  nature?
5    A.  I'm not sure.
6    Q.  Do you know whether you, Filias,
7  retained any rights to enter and inspect the
8  vessel for any reason?
9    A.  I don't, I'm not sure.
10    Q.  Did Filias have, did Filias retain
11 any keys to the Marshall vessel?
12    A.  No.
13    Q.  Do you know whether there was any
14 understanding between you and Marshall
15 regarding any prohibition of Marshall creating
16 any kind of nuisance, playing loud music or
17 anything like that?
18    A.  Not that I'm aware of.
19    Q.  Again do you have any understanding
20 as to whether there was any kind of
21 understanding between Filias and Marshall as
22 to rights which Filias retained in the event
23 that Mr. Marshall's boat created some kind of
24 a safety hazard to itself or to the pier or to

Page 85

1  adjoining boats?
2    A.  I don't think so.
3    Q.  Would it be fair to say that there
4  are a lot of things that I just asked you
5  about as far as you know simply were never
6  discussed one way or another between the two
7  parties?
8    A.  I can't answer that.
9    Q.  Other than what we do know about the
10 lease or what seems to have been the subject
11 of any understanding between you and Marshall
12 other than the price which may have increased
13 over the years, have there been any changes
14 that you can identify in terms of the
15 agreement between Filias and Marshall over the
16 years since he has been renting?
17    A.  I can't answer that.
18    Q.  Do you even know whether the place
19 has gone up over the years for his slip?
20    A.  I believe that it has.
21    Q.  Are you aware of any dock, I'm
22 covering something that I have already covered
23 but, do you have any other documents that
24 relate or refer to your agreement with Mr.

22  (Pages 82 to 85)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

ALEX FILIAS
July 29, 2005

Page 86

1  Marshall with respect to the slip other than
2  Exhibit 5, do you know of any correspondence
3  or memorandums or anything like that?
4      A.  No.
5      Q.  I think there was just one to be
6  fair, I think there was just one letter, and
7  I'll just show that.to you.  1 think regarding
8  parking.
9          MR. KIESLING:  I think I've got
10 it.
11         MR. MCCORMICK:  I think I have it
12 too, Jeff.
13     Q.  Let me just, since we're on the
14 subject, let me show you, why don't I show you
15 this document right here and just ask you if
16 you have ever seen that, Mr. Filias, before?
17     A.  I didn't personally see this, no.
18 This is all some of the stuff that comes to
19 the office that I don't typically see.
20         MR. MCCORMICK:  Why don't we just
21 mark that.
22
23         (Exhibit 6 marked)
24

Page 87

1      Q.  So I gather if there was any other
2  documents along this line related to the
3  contractual relationship between Ted Marshall
4  and Filias, the person who would probably have
5  more knowledge of that would be Paula?
6      A.  I would say that's right.
7      Q.  Let me ask you a little bit about the
8  incident which unfortunately leads all to this
9  conference room here today.  At some point Mr.
10 Filias did you learn from any source that Mr.
11 Marshall is at least alleging that his vessel
12 had been damaged out at the #1 slip during the
13 2004 season?
14     A.  Could you ask the question again?
15     Q.  Did you learn at some point that Ted
16 Marshall was saying that his boat had been
17 damaged at the #1 slip last season?
18     A.  Yes, I was aware of it.
19     Q.  How did you find out about it
20 initially?
21     A.  I happened to be working at that site
22 and I ran down to see if I could give him a
23 hand.  We didn't know what was happening to
24 his boat.  That is how I learned of it.

Page 88

1      Q.  What did you observe when you got
2  down to the slip?
3      A.  Ted was, let's see, he was untying
4  his boat and trying to bring it up on sure to
5  try and keep it from sinking.
6      Q.  Okay.  And which boat was this?
7      A.  I guess you would call it a cruising
8  boat, a fishing boat maybe.
9      Q.  Not the pontoon boat?
10     A.  Not the pontoon.
11     Q.  Not the motor boat?
12     A.  No, not the motor boat, right.
13     Q.  What did he say to you, if you
14 recall?  I don't mean specifically, but
15 generally do you remember?
16     A.  No.
17     Q.  Was he so, he was trying to untie it
18 from the pier to get it to the shore or to the
19 land?
20     A.  From what I can remember, yes.
21     Q.  All right.  So you were actually
22 there when it was all going on, you were
23 actually at the site?
24     A.  I was, I don't remember how long

Page 89

1  he was there before me trying to figure out
2  what was happening, but I was there probably
3  shortly after.
4      Q.  What did you do when you saw what Mr.
5  Marshall was trying to do, if anything?
6      A.  What did I do?
7      Q.  Yes.
8      A.  I offered my assistance in any way I
9  could help him.
10     Q.  Okay.  And were you able to help him
11 take you up on that?
12     A.  Yes, let's see.  I tried getting a
13 number of pumps going, I had tools in my truck
14 if you needed any tools.  I offered any tools
15 that he could use.  I offered him the use of
16 my own pump and that was pretty much it, I
17 mean.
18     Q.  Did you, did he take you up on using
19 your pumps?
20     A.  Oh yes.
21     Q.  Was he trying to pump the boat out
22 using pumps he had as well?
23     A.  Yes.
24     Q.  What was the condition of the boat

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

ALEX FILIAS
July 29, 2005

Page 90

1  when you saw it, did it appear to be sinking?
2      A.  Yes.
3      Q.  So you together were trying to try to
4  pump the boat, was that successful, were you
5  able to keep the boat afloat?
6      A.  It seemed to help it maintain it
7  anyway.
8      Q.  What happened next, I'm just trying
9  to get an idea of what you remember about that
10  day?
11      A.  So let's see, it was maintained the
12  water and then someone, another boat offered
13  to help on for their boat to toe it over to
14  Perkins Marine and then lift it out of the
15  water.
16      Q.  All right.  So you got the boar
17  sufficiently oriented so that you could
18  transport it to Perkins?
19      A.  Yes.
20      Q.  As far as you know it was hoisted out
21  at Perkins?
22      A.  Yes.
23      Q.  Did you actually, were you involved
24  in that part of the process, or did you ----

Page 91

1      A.  I was on the boat maintaining the
2  pump when we brought it to make sure that it
3  was pumping.
4      Q.  On the trip over to Perkins?
5      A.  Yes.
6      Q.  Was Ted on the boat also with you?
7      A.  He was.  He had his foot in a towel
8  in the hole.  I'm sure you've heard that
9  story.
10      Q.  Well, you're probably leading into
11  this.  At some point did he and you discover
12  at least what was causing the water to come
13  into the boat?
14      A.  Ted found the hole, yes.
15      Q.  Where was that located, do you
16  remember?
17      A.  It was in the bow on the starboard
18  side.
19      Q.  And he tried to plug the hole?
20      A.  Yes.
21      Q.  Using his towel and his foot?
22      A.  His buddy there, I can't remember his
23  name.  They were trying to find something to
24  put in there.

Page 92

1      Q.  Okay.  So his job on the way over was
2  trying to minimize what was coming in?
3      A.  Yes.
4      Q.  You were trying to keep the boat
5  pumped on the trip over to Perkins?
6      A.  Right.
7      Q.  Somebody else was towing to Perkins
8  obviously?
9      A.  Actually no.  Was it?  No, I wasn't
10  in the boat.  I was in the boat yes, no.
11  You're right, I was in the boat that was
12  pulling Ted's boat holding onto I think the
13  rope.  (Indicating)  Something like that.
14      Q.  Do you know whose boat that was by
15  any chance?
16      A.  I have no idea.
17      Q.  So you were there for the trip, you
18  actually did get it hauled out at Perkins?
19      A.  Yes.  We hung around until the boat
20  was out.
21      Q.  Once it was out did you have a chance
22  to get a better look at the hole in the hull?
23      A.  I think we all took a peek at the
24  hole.

Page 93

1      Q.  Was it just one hole?
2      A.  I think it was.  I don't remember if
3  there was more than one hole.  It looked like
4  a hole that was in one spot.
5      Q.  Do you remember the size of the hole
6  at all?
7      A.  It was probably at least three
8  inches, I would say.
9      Q.  In diameter?
10      A.  You know, pressed up maybe like.
11  (Indicating) I'm not sure if it was like a
12  perfect circle or not.
13      Q.  I'm sorry.  This is slow going.  I'm
14  usually pretty fast at depositions, but this
15  is just.  Do you remember what the tide was at
16  the time when you first went over and started
17  helping Ted with his boat?
18      A.  I would say the tide was on the
19  upside.  I'm not sure exactly what level it
20  was at, but there was water.
21      Q.  It wasn't dead low as far as you
22  know?
23      A.  No.
24      Q.  Let me show you a photograph,

24 (Pages 90 to 93)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 94

1 Mr. Filias, from the archives here. I'll just
2 ask you if you ----
3     A.  It looks like a little scrape of one
4 hole I guess.
5     Q.  Does that comport with your memory
6 of the hole we have just been talking about?
7     A.  I think that's the hole.
8         MR. MCCORMICK: Why don't we mark
9 that please.
10
11         (Exhibit #7 marked)
12     Q.  Now once you had the boat ashore at
13 Perkins did you have any conversations with
14 Ted Marshall or anybody else about what would
15 have caused that hole?
16     A.  I would say we probably were talking
17 about what could have caused that.
18     Q.  Okay.
19     A.  I don't think at that time we knew
20 exactly what it was.
21     Q.  At some point did you determine what
22 it was that caused the hole?
23     A.  Yes, I think it was either a day,
24 either that same day or a day or two later.

Page 95

1 Ted was down there at a low, low tide and he
2 visually saw a pole and gave me a call.  He
3 saw a piece of pipe coming out of the ground.
4     Q.  In slip #1?
5     A.  H'm-h'm.
6     Q.  Yes?
7     A.  Yes.
8     Q.  So he gave you a call when he saw
9 that?
10     A.  Yes.
11     Q.  Did you go down and take a look at it
12 yourself?
13     A.  Yes.
14     Q.  Okay.  When you first saw the pole
15 had you ever seen that before?
16     A.  No.
17     Q.  Did you in your own mind, I'm just
18 asking for your own thought process at that
19 time or did you, did you have any idea what
20 the pole was doing there and what it was from?
21     A.  Not at the time, no.
22     Q.  At any time since have you formulated
23 any in your own mind, I'm not asking for an
24 expert opinion here.  I'm just asking whether

Page 96

1 you formulated any thought as to where that
2 pole came from?
3     A.  I really don't know where it came
4 from.
5     Q.  Did you have any thought as to what
6 it is?
7     A.  I believe it was probably some type
8 of piling or something to do with something on
9 the water there.  Whether it was ours
10 originally or not, I don't know.
11     Q.  Okay.
12     A.  But the pole is you know, the pipe I
13 had never seen before.
14     Q.  Did you observe at or about that time
15 any similar pipes in any of the other slips?
16     A.  No, just other than that debris that
17 we talked about.  I really can't remember if
18 we had seen more pipe or whatever, and pulled
19 it out.  But I know that we pulled and removed
20 some debris like I was telling you, and we did
21 a very thorough look of all the slips at a
22 lower tide and we didn't see anything.
23     Q.  Okay.  But what I'm talking about is
24 that day or within a few days after this,

Page 97

1 did you besides the pole and Mr. Marshall's
2 slip did you find any other poles at that time
3 in any of the other slips?
4     A.  No.
5     Q.  Was there a pole in slip #4 if you
6 remember in Jody Davis's slip?
7     A.  Let me see here.  I'm just trying to
8 put it altogether here.  But I think Ted said
9 that the fellow that he had hired to do it he
10 pulled out two pipes and there could have been
11 one there.  I can't remember.
12     Q.  Okay, that's fine.  I'm just asking
13 for your memory?
14     A.  Yes, no, I'm pretty sure that there
15 were two pipes pulled.
16     Q.  Okay.
17     A.  I want to say that.
18     Q.  How did it come about that those
19 pipes were pulled, did you hire somebody to do
20 that?
21     A.  Ted new this fellow that had this, I
22 think it was called Anchor, Mooring and Dive,
23 he knew the guy and made the call and he came
24 and he had pulled him out.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 98

1  Q.  Were you there when that was done?
2  A.  No.
3  Q.  Let me show you some photographs that
4  Mr. Marshall give me. I don't know, these
5  have been produced to your counsel, I don't
6  know if you have ever seen them. There's
7  actually two photographs on this.
8  A.  I can see they're two pipes.
9  Q.  Actually I think there's three there.
10  A.  Three. This one here when Ted had
11  pulled these up, I don't know what the heck
12  this one was. It had like a point on it.
13  Q.  Okay. So one had a pointy end on it?
14  A.  Yes. We have never had anything like
15  that.
16  Q.  Okay. But you're not sure, I guess if
17  you look at those photographs you can identify
18  which specific pole was the one in Ted's slip,
19  right?
20  A.  No.
21        MR. MCCORMICK: Why don't we mark
22  these two phonographs as Exhibit 8.
23
24        (Exhibit 8 marked)

Page 99

1  Q.  Did you ever get to see these poles
2  once they were actually pulled out?
3  A.  Yes, they stayed there for awhile.
4  Q.  Can you describe them for me? I mean
5  you just noted that one of them has a pointy
6  end which is, but can you describe these poles
7  for me in terms of diameter and length?
8  A.  Yes. Now you are asking me to go
9  back now because I think we did measure them.
10  I think they were three plus inches maybe. I
11  wasn't sure if they were galvanized or not at
12  the time, I'm still not sure. They may be.
13  Q.  In that ----
14  A.  They're bent. It looks like most of
15  them were buried.
16  Q.  Any idea of the length?
17  A.  I did measure them, but I don't
18  remember how long exactly they were.
19  Q.  Do any of these poles look in any way
20  similar to the poles that you use pre wood
21  pilings as pilings?
22  A.  Yes, they're metal pipe.
23  Q.  Let me see if I can complete this and
24  get you out of here. I have been produced a

Page 100

1  couple of photographs. Let me show you a
2  series of photographs that were produced, I'll
3  represent to you by your lawyer. I'm just
4  going to have, there are three photographs and
5  I'm going to ask you if you have ever seen
6  those before, Mr. Filias?
7  A.  I'm not sure if this is the exact
8  photo that I have seen, but I have seen this.
9  I think I have seen this. I'm not sure that I
10  have seen every photo that Ted has taken or
11  what the insurance adjuster took.
12  Q.  You don't know if those ----
13  A.  That looks like a pole in the water.
14  Q.  That is what it looks like, doesn't
15  it?
16  A.  Yes.
17  Q.  So you didn't take these pictures as
18  far as you know?
19  A.  We may have taken some pictures, but
20  I think Ted has taken a lot of pictures. I
21  think that the guy that the insurance
22  investigation took pictures.
23        MR. MCCORMICK: Why don't we,
24  since we talked about them, we'll mark the

Page 101

1  series of three photographs.
2
3        (Exhibit 9 marked)
4
5  Q.  So just to be clear, you're not sure
6  what these depict, and in fact you can't say
7  one way or another that was the actual pole in
8  slip #1?
9  A.  No, I think that is the pipe in the
10  boat slip #1.
11  Q.  Is that the pipe that when you went
12  back after Mr. Marshall had called you, and
13  you went down and take a look at, do you
14  believe that these pictures depict the pipe
15  that you saw in slip #1?
16  A.  I think so, yes.
17  Q.  Once you saw this pipe in slip #1,
18  how long did it take to get Anchor and Mooring
19  Service to come down and pull them out, was
20  that like the same day?
21  A.  I can't remember.
22  Q.  Do you know when year wise it became
23  your job to start putting these, you know way
24  back in the day putting the metal pilings in

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 102

1  and taking them out?
2      A.  I can't pinpoint a year, no.
3      Q.  Is that something that your father
4  did before you himself or did you used to hire
5  people you know, before you started doing it?
6      A.  I don't know.  I don't know what
7  happened many years ago.
8      Q.  Okay.  Let me just show you another
9  picture here.  I just want to show you, Ted is
10  giving us a little explanation of what it is
11  here.  But let me show you another pictures,
12  two pictures.  Poles here lying adjacent to or
13  in the area of the pier?
14      A.  Right.
15      Q.  Are those the poles that you, before
16  you had gone to the wooden dock that you would
17  use in securing the ----
18      A.  Yes.
19          MR. MCCORMICK:  Why don't we mark
20  that, please?
21
22          (Exhibit 10 marked)
23
24      Q.  I may have asked you this before,

Page 103

1  Mr. Filias.  Were you there when Anchor Dive
2  came in and pulled those out?
3      A.  No.
4      Q.  So did you ever have a conversation
5  with Anchor, anybody from Anchor Dive about
6  the poles or pulling them or anything like
7  that?
8      A.  Just to pay him.
9      Q.  Just to pay him, okay.  How did that
10  work, did they just send you a bill and you
11  paid him or did you, did he call you?
12      A.  The bill probably came in the office
13  and we paid it, sent him a check.
14      Q.  So you never had a conversation with
15  anybody from Anchor Dive about what the poles
16  were or where they might have come from or
17  anything like that?
18      A.  I think I did talk to him, but I
19  don't remember.  I think it was more of a
20  payment thing.  Maybe a little bit of talk
21  about the poles.  But I don't remember exactly
22  what we did.
23      Q.  Now at some point these were pulled
24  out, I think you testified earlier did

Page 104

1  somebody come out from your insurance company
2  to investigate this?
3      A.  There was an investigator, yes.  I
4  don't know if he had come prior to pulling the
5  pole or not.  I don't remember that clearly.
6      Q.  All right.  And did he interview you?
7      A.  Yes.
8      Q.  I assume you told him pretty much
9  everything that you have told us today, right?
10      A.  Yes.
11      Q.  Do you have an understanding as to
12  whether he went down and took any photographs?
13      A.  I believe that he did.
14      Q.  Did you actually meet him at the ----
15      A.  Yes, I met him out at the site, yes.
16      Q.  Do you remember his name?
17      A.  I think his name was Jeff.  I can't
18  remember his last name.  I think it was Jeff
19  something.
20      Q.  Do you have any idea whether  ----
21      A.  Jeff Magnuson, I believe.
22      Q.  Jeff Magnuson, okay.
23      A.  Is that right?
24      Q.  That sounds right, and I probably

Page 105

1  have it in my file somewhere.
2      Q.  Do you know whether anything else
3  that he did in terms of his investigation
4  other than talk to you and take some
5  photographs?
6      A.  I want to say I think he had me
7  measure the pipe maybe with him with pictures.
8  I don't know personally.
9      Q.  Right.  I'm just asking what you are
10  aware of.  Okay.  Do you know whether any
11  marine surveyor was called in by the insurance
12  company or anybody else to do any marine
13  surveys following?
14      A.  I don't know.
15      Q.  Did you ever talk to Ted Marshall
16  just even just tossing around ideas about the
17  pipe and where it may have come from and
18  things like that at all?
19      A.  I think we had talked about it.
20      Q.  Do you have any memory of the
21  substance of that conversation?
22      A.  Not particularly. I mean we just
23  talked about the pole and what the hell
24  happened, you know.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

*Exh. "B"*

ALEX FILIAS
July 29, 2005

Page 106

1    Q.  Beside the insurance investigator and
2  your attorney, and I obviously don't want to
3  hear anything you said to him, was there
4  anybody else that you talked to about this
5  incident?
6    A.  Obviously my wife knew about it
7  because I had to tell her what was going on
8  that day.  Anyone that was connected at that
9  point, I can't remember where or who I talked
10  to last week, never mind a year ago.
11    Q.  I understand.  Let's see.  Let me see
12  if there are any other pictures that I want
13  you to look at before we go.  Let me show you
14  another pictures and pay attention to the
15  bottom picture of this one.  Do you recognize
16  the boat?
17    A.  That's Ted's pontoon boat.
18    Q.  Do you recognize, are you able to
19  tell from this where it sitting vis-a-vis the
20  doc in this photograph?
21    A.  He is sitting on boat slip #1.
22    Q.  Now in this picture, and we don't
23  know what the moons were like, but it appears
24  that at least part of the dock is sitting,

Page 107

1  I'm sorry.  At least part of the boat is
2  sitting on mud, right?
3    A.  I would say yes.
4    Q.  My question sir that goes back to the
5  question I asked you a little while ago in the
6  deposition which is that over the years, well,
7  let's just take slip #1.  Have you noticed
8  just from your own anecdotal views of the slip
9  whether that slip has been filing in at all
10  over the years in terms of becoming shallower
11  and shallower?
12    A.  I think like I said earlier, I think
13  it can change year to year, sometimes I might
14  notice that this mud plot here is more taken
15  out here probably from the flow of the water.
16  Sometimes it's here.  I mean I really don't
17  know how much it changes from year to year,
18  but you know ----
19    Q.  Okay, that's fine.
20    A.  I'm not even sure the tide that would
21  be.
22    Q.  Right, okay.  Can we just mark that,
23  please.
24

Page 108

1    (Exhibit 11 marked)
2
3    Q.  Do you know whether you testified
4  earlier that you had at least for a certain
5  amount of time, and I understand you're not
6  sure you still had or not, you had the right
7  to drain within the specifications of the
8  permit that you got, correct?
9    A.  Yes.
10    Q.  Do you know whether slip #1 is the
11  area where slip #1 is whether that is an area
12  you would have had the right to dredge
13  probably where Mr. Marshall's boat sits?
14    A.  Without looking at the plan I don't
15  know if anyone has that here or not.  I would
16  imagine that the dredging that we would have
17  or were permitted for probably would have
18  taken you know, the entire floatation area.
19    Q.  All right.  I think I'm about ready
20  to call it a day.  Unless you guys want to
21  keep going.
22    MR. KIESLING:  I'm going to hold
23  off on my questions.  There have been plenty
24  asked.

Page 109

1    MR. MCCORMICK:  I think I'm all
2  set, that's all I have.
3    MR. KIESLING:  I have nothing.
4    COURT REPORTER:  Is he going to
5  read and sign or waive that?
6    MR. MCCORMICK:  We'll do whatever
7  you want.
8    MR. KIESLING:  We'll waive it.
9    COURT REPORTER:  Just a regular
10  transcript?
11    MR. KIESLING:  And a mini.
12
13    (Whereupon the deposition ended)
14
15
16
17
18
19
20
21
22
23
24

28  (Pages 106 to 109)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

*Exh. "B"*

**ALEX FILIAS**
**July 29, 2005**

Page 110

1    I, THOMAS J. HOUTON, a Notary Public
2  in and for the Commonwealth of Massachusetts,
3  do hereby certify that ALEX FILIAS came before
4  me on the 29th day of July, 2005, was
5  satisfactorily identified and duly sworn, at
6  One Western Ave., Gloucester, Massachusetts
7  and was sworn to testify to the truth and
8  nothing by the truth as to his knowledge
9  touching and concerning the matters in
10  controversy in this cause; that he was
11  thereupon examined upon his oath and said
12  examination reduced to writing by me; and that
13  the statement is a true record of the
14  testimony given by the witness, to the best of
15  my knowledge and ability.
16    I further certify that I am not a
17  relative or employee of the counsel/attorney
18  for any of the parties, nor a relative or
19  employee of such parties, nor am I financially
20  interested in the outcome of the action.
21    WITNESS MY HAND this 9th day of
22  August, 2005.
23  THOMAS J. HOUTON    My Commission expires:
24  Notary Public    March 20, 2009

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

Exh: "B"





*Exh. "B"*



RECEIVED

JUL 2 5 2005

ORLANDO & ASSOCIATES

Exh."B"



JUL 2 5 2005

*Exh. "B"*