**DEPOSITION OF PAULA FILIAS**

MiniDep by Kenson

VOL. 1, PAGES 1-39

COMMONWEALTH OF MASSACHUSETTS
UNITED STATES DISTRICT COURT

CIVIL ACTION NO. 04-12029 DPW

EDWARD MARSHALL,
              Plaintiff,

v.

FILIAS REALTY TRUST,
              Defendant.

DEPOSITION OF PAULA FILIAS, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure on behalf of the Plaintiff, before Geraldine R. Parisi, P.C.R., and a Notary Public in and for the Commonwealth of Massachusetts, at the Office of Orlando & Associates, One Western Avenue, Gloucester, Massachusetts, commencing on Monday September 12, 2005 at 10:53 a.m.

NORTH SHORE COURT REPORTING
6 St. Anthony's Lane
Gloucester, Massachusetts 01930
Tel. 978-281-6886 ~ Fax. 978-281-4422

APPEARANCES:

BRIAN S. MCCORMICK, ESQ.
ORLANDO & ASSOCIATES
One Western Avenue
Gloucester, Massachusetts 01930
    Counsel on behalf of the Plaintiff.

MELISSA ARNOLD, ESQ.
MORRISON MAHONEY LLP
250 Summer Street
Boston, Massachusetts 02210
    Counsel on behalf of the Defendant.

I-N-D-E-X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Paula Filias | | | | |
| (By Mr. McCormick) | 4 | ** | ** | ** |
| (By Ms. Arnold) | ** | ** | ** | ** |

E-X-H-I-B-I-T-S

| NUMBER | | PAGE |
|---|---|---|
| 1 | Application - Filias Realty Trust. | 26 |
| 2 | Invoice. | 27 |

\* \* \*

- iii -

North Shore Court Reporting - (978) 281-6886

Exhibit "C"

```
 1              STIPULATIONS
 2
 3        It is hereby stipulated and agreed by
 4   and between counsel for the respective parties
 5   that the deponent will read and sign the
 6   deposition transcript under the pains and
 7   penalties of perjury within thirty (30) days of
 8   receipt of same or it is deemed to have been
 9   signed; that the notarization and filing are
10   hereby waived.
11        It is further stipulated that, except as
12   to the form of the question, all objections and
13   motions to strike are reserved to the time of
14   trial.
15
16        PAULA FILIAS, first having been duly
17   sworn, deposes and says as follows:
18
19            DIRECT EXAMINATION
20 Q  (By Mr. McCormick) Good morning, Ms. Filias, we
21    just met a minute ago. My name is Brian McCormick
22    and I represent the plaintiff Mr. Marshall in this
23    case. I'm going to be asking you some questions
24    this morning. If at any time you don't understand
                        - 4 -
```

```
 1    my question please let me know and I will rephrase
 2    it for you okay?
 3 A  Um hmm.
 4 Q  And the other thing I just ask is if you can
 5    remember and I will remind you about this is when
 6    you are answering a question yes or no, if you can
 7    try to remember to verbalize yes or no otherwise
 8    the record won't show that.
 9 A  Yes.
10 Q  But you'll forget and we'll remind you of that.
11    Also again, for the sake of our stenographer, if
12    you'll allow me to finish my question before you
13    start your answer and I'll let you finish your
14    answer before I start my next question again, will
15    make life easy for Geri. And finally, if at any
16    time you need a break to talk to your lawyer or to
17    use the phone or for any reason, just let me know
18    and we'll just stop, okay?
19 A  Okay.
20 Q  The only thing I ask when we take a break is if I
21    have a pending question before you that you just
22    answer the question before we take the break. I
23    don't expect this to take very long. I don't
24    suspect I'll be covering as much stuff with you as
                        - 5 -
```

```
 1    I did with your husband because I think he's more
 2    involved in the construction side of things. But
 3    we'll find out. So there we go.
 4        Would you state your name and address
 5    for the record please?
 6 A  Paula Filias, 1 Woodhollow Road, Manchester, Mass.
 7 Q  Are you presently employed?
 8 A  Yes.
 9 Q  Where do you work?
10 A  I work for Filias Management.
11 Q  What is your position with Filias Management?
12 A  Controller, manager.
13 Q  And your husband is Alex Filias who is a member of
14    the Filias family; correct?
15 A  Correct.
16 Q  How long have you been working as the manager or
17    the controller of Filias Management?
18 A  Thirteen years.
19 Q  Filias Management, what does Filias Management
20    manage?
21 A  Filias Management manages four separate entities.
22 Q  What are those please?
23 A  New Filias Main Street Realty Trust which is the
24    property in question.
                        - 6 -
```

```
 1 Q  Okay, that's the Landing Apartments in Essex?
 2 A  Yes.
 3 Q  Okay, just for the sake of completeness, what are
 4    the other entities that comes under the umbrella
 5    of Filias Management?
 6 A  New Filias Elm Street Realty Trust.
 7 Q  Does that trust own another piece of real
 8    property?
 9 A  Yes.
10 Q  Is that apartment buildings also?
11 A  Yes.
12 Q  Where are those located?
13 A  Manchester.
14 Q  And the next one?
15 A  Desmond Avenue Realty Trust.
16 Q  Same thing, that trust holds real estate?
17 A  Yes.
18 Q  Also rental properties?
19 A  Yes. New F. Talia Filias Realty Trust.
20 Q  Same thing there?
21 A  Correct.
22 Q  So would it be fair to say that Filias Management
23    manages four properties, four rental properties?
24    Would that be fair to say?
                        - 7 -
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | I think when Alex was here I think he testified, |
| 3 | | is there also a Filias Construction Company? |
| 4 | A | Yes. |
| 5 | Q | You're not involved in managing that? |
| 6 | A | I'm an employee of Filias Construction Company |
| 7 | | also. |
| 8 | Q | What does Filias Construction Company do? |
| 9 | A | It constructs homes and does repairs and |
| 10 | | maintenance on the apartments. |
| 11 | Q | To your knowledge, Ms. Filias, that's actually a |
| 12 | | company, Filias Construction Company? |
| 13 | A | Filias Construction is a corporation. |
| 14 | Q | Okay. |
| 15 | A | A Massachusetts Corporation. |
| 16 | Q | Just so we get our -- I still don't think I have |
| 17 | | this right so I'm going to try again. |
| 18 | | The trust that presently owns the |
| 19 | | Landing Apartments, could you give me the name of |
| 20 | | that trust again please? |
| 21 | A | New Filias Main Street Realty Trust. |
| 22 | Q | Because I think there was some discussion about a |
| 23 | | 138 Main Street Realty Trust, is that the same --- |
| 24 | | - |

- 8 -

| | | |
|---|---|---|
| 1 | A | Same. |
| 2 | Q | Same thing? |
| 3 | A | It's hard for us to remember too. |
| 4 | Q | When was the property the Landing transferred into |
| 5 | | the New Filias Main Street Realty Trusty? |
| 6 | A | January 2003. |
| 7 | Q | Before January 3, do you know what entity held |
| 8 | | that property? |
| 9 | A | Filias, New Filias Realty Trust. |
| 10 | Q | In any event, the New Filias Main Street Realty |
| 11 | | Trust is the legal entity that presently owns the |
| 12 | | Landing Apartments on Main Street in Essex; |
| 13 | | correct? |
| 14 | A | Correct. |
| 15 | Q | Now as manager/controller at Filias Management can |
| 16 | | you just tell me what your general duties and |
| 17 | | responsibilities are? |
| 18 | A | Pay bills, renew leases, invoice for the boat |
| 19 | | slips. |
| 20 | Q | Anything else? |
| 21 | A | Sometimes I show apartments, negotiate loans. I |
| 22 | | think that covers it. |
| 23 | Q | Are you involved in the actual collection of rent |
| 24 | | as well, do you oversee that as well? |

- 9 -

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | When you say negotiate loans what would that be in |
| 3 | | respect to? |
| 4 | A | If we have to do a borrowing for some reason. |
| 5 | Q | In a general sense, if the tenants have a problem |
| 6 | | or a concern are you the person they would call? |
| 7 | A | They'd call the office. Sometimes I will answer |
| 8 | | the call. |
| 9 | Q | Where is the office located? |
| 10 | A | Manchester. |
| 11 | Q | How many units in the Landing? |
| 12 | A | Nineteen. |
| 13 | Q | You testified that you also invoice for boat |
| 14 | | slips. Are those boat slips located at the |
| 15 | | Landing Apartments? |
| 16 | A | Yes. |
| 17 | Q | Do you know how many boat slips are located there? |
| 18 | A | It varies depending on what size boats we have |
| 19 | | annually. So if there are smaller boats, we might |
| 20 | | have one more or if there are larger boats around |
| 21 | | sixteen. |
| 22 | Q | Ever since you've been involved in managing the |
| 23 | | Filias Management or being a manager with them, |
| 24 | | have those slips always been there? Not in their |

- 10 -

| | | |
|---|---|---|
| 1 | | exact form but have there always been boat slips |
| 2 | | there? |
| 3 | A | Yes. |
| 4 | Q | Do you know who the trustees of the New Filias |
| 5 | | Main Street Realty Trust are? |
| 6 | A | Charles and Alex Filias. |
| 7 | Q | I'll ask you, again my sense from talking to Alex |
| 8 | | was that this was more his area but so if you |
| 9 | | don't know the answers to any questions, just let |
| 10 | | me know. |
| 11 | | Do you know whether there have been any |
| 12 | | structural changes or modifications to those slips |
| 13 | | during let's say the time period that you've been |
| 14 | | the manager at Filias Management Company? |
| 15 | A | We changed the pilings from metal to wood. |
| 16 | Q | Do you know when that was done? |
| 17 | A | It was ninety -- no, no. The first year we had |
| 18 | | wooden pilings was 2003, sorry. |
| 19 | Q | That's okay. Any other changes you can think of |
| 20 | | over the years besides that? |
| 21 | A | When we applied and received a Chapter 91 License |
| 22 | | the configuration was changed. |
| 23 | Q | What is a Chapter 91 License if you know? |
| 24 | A | It's a license to operate -- it's a license to put |

- 11 -

Exh. "C"

```
 1     a structure in the waterway.
 2  Q  Any idea of the time frame that you did that, that
 3     you obtained this license?
 4  A  That's what I think happened in '98.
 5  Q  Are you familiar other than in a general sense
 6     that there were changes in '98 and 2003, I mean
 7     are you very familiar with the specifics of those
 8     changes?
 9  A  No, no.
10  Q  Is that something Alex handled --
11  A  Yes.
12  Q  -- more day-to-day?
13  A  Yes.
14  Q  Do you know who did the actual work in '98 and
15     2000 -- well, let's start with 1998, do you know
16     who did the physical work on the structures?
17  A  Alex.
18  Q  How about in 2003 when it was changed from metal
19     to wood?
20  A  We hired Norris Marsten to -- he had a special
21     type of mini-barge with a pile driver on it. He
22     was hired to come and drive the pilings in.
23  Q  Do you know whether by virtue of either the 1998
24     or the 2003 constructions, whether the pier
                           - 12 -
```

```
 1     ultimately moved any further into the river or
 2     moved closer to shore, do you have any knowledge
 3     one way or the other on that?
 4  A  No.
 5  Q  As I understand it, before the wood pilings were
 6     put in each year Alex would go out in the spring
 7     and put the metal pilings in and take them back
 8     out in the fall?
 9  A  Yes.
10  Q  The wood pilings are now permanent; is that right?
11  A  Hopefully.
12  Q  Did you have a written contract with Mr. Marsten
13     with respect to his work?
14  A  No.
15  Q  The 2003 transition from metal to wood, do you
16     know whether you had to hire any marine architects
17     or engineers to carry out that work?
18  A  No.
19  Q  Okay you don't know or you didn't?
20  A  No, we didn't.
21  Q  But in 1998 when you did the Chapter 91 project
22     you did have to hire engineers and so on; right?
23  A  Yes.
24  Q  Do you know whether during the work that was
                           - 13 -
```

```
 1     carried out in 2003 by Alex and I think he said an
 2     employee or two and Mr. Morris then as well,
 3     whether they during that project they identified
 4     any ----
 5             MS. ARNOLD: Objection, 2003 or '98?
 6             MR. MCCORMICK: No, I'm sorry, 2003.
 7  Q  Let me rephrase the question.
 8             In 2003 when Alex and Mr. Morris were
 9     carrying out the work transitioning from metal to
10     wood, do you have any knowledge as to whether or
11     not they found during that project any debris or
12     submerged pilings or anything of that nature
13     during that work?
14  A  No.
15  Q  Do you know when Ted Marshall first leased a slip
16     from Filias?
17  A  Maybe ten years ago.
18  Q  Has he had the same slip throughout that time with
19     Filias, the same location?
20  A  As far as I can remember. He's been in that
21     particular slip number one for quite some time.
22  Q  Slip number one if you're walking out onto the
23     pier would be the furthest most left slip; is that
24     correct? If you were looking out onto the river?
                           - 14 -
```

```
 1  A  If you were walking out on to the gangway?
 2  Q  Yes.
 3  A  The very first finger that juts off of the main
 4     structure --
 5  Q  Right.
 6  A  -- he is on the left side of that first finger.
 7  Q  How do you -- let's try to be specific here.
 8     Let's take the time frame of the spring of 2004.
 9             Did Mr. Marshall lease a slip from you
10     for the summer season of 2004?
11  A  Yes.
12  Q  Slip number one?
13  A  Yes.
14  Q  How do you gauge the price to charge Mr. Marshall
15     for that particular slip?
16  A  In the spring I called the marinas in town and I
17     see what everybody's charging and then I set a
18     price, it's a per-foot price, and apply it to what
19     information I have based on the sizes of
20     everybody's boats.
21  Q  Let me just back up for a second, do you remember
22     how it was that Mr. Marshall came to rent slips
23     from Filias in the first place?
24  A  He called us.
                           - 15 -
```

| | | |
|---|---|---|
|1 Q|Did he talk to you? Do you have a memory of a|
|2|specific conversation at all?|
|3 A|Not from the very first year that he rented from|
|4|us. We've always had -- every year we've always|
|5|had at least one or two conversations because Ted|
|6|ran his company's business. He was very diligent|
|7|in terms of asking, you know, if the boat slip|
|8|would be secured for him that year and would he|
|9|still have it. So he always liked to make sure|
|10|that he was going to have the slip.|
|11|So he called -- would he typically call you ahead|
|12|of time and make sure that you knew that he wanted|
|13|the slip again that year?|
|14 A|Yes. Typically in the winter sometime I will send|
|15|out a letter to everybody that was on the slips|
|16|the prior summer and I will ask them for a|
|17|deposit, $250 just good faith deposit, and with|
|18|that letter I send what I would call an|
|19|application with their name and their boat and how|
|20|big their boat is. So if they return it with|
|21|their deposit then I know what to balance bill|
|22|them. And if they don't return it then I assume|
|23|they don't want the slip and before I actually|
|24|give up the slip I'll call them and say I didn't|

- 16 -

1 Q And he would generally identify the other boats in
2     his application; is that your memory? In addition
3     to the pontoon boat?
4 A Yes.
5 Q Now do you differentiate, Ms. Filias, between a
6     full water slip and what people would routinely
7     call a mud slip in the Essex River in terms of
8     pricing?
9 A Yes.
10 Q Has that always been the case ever since you've
11     been managing those slips?
12 A Yes.
13 Q What's the -- for the summer of 2005, what was the
14     price difference between one to the other?
15 A Eighty-five for water and seventy-five for mud.
16 Q In your mind, can you tell us what a water slip
17     is, what your understanding of a water slip is?
18 A A slip that has access to the water at any tide,
19     high or low.
20 Q So you could always pull it in, always pull it out
21     regardless of the tide; is that correct?
22 A Yes. I don't know always, can you say always,
23     there are tides that are extreme.
24 Q That's fine, you can let me know that.

- 18 -

1     get up deposit does that mean you definitely want
2     to give up your slip or did you just forget.
3          So if I didn't send that letter out
4     asking for a deposit Ted would call me and say are
5     you sending the letter out because I want my slip.
6     And I would say don't worry, Ted, the letter is
7     coming and I sent it out.
8 Q I might have an example of one of those here. In
9     any event, it would be fair to say that each year
10     you knew what boat Mr. Marshall would be using in
11     that slip; is that fair to say?
12 A Well he always paid for a pontoon boat. That's
13     the boat that I would anticipate being in that
14     slip was the pontoon boat. He would fill out on
15     his application that he had several boats but
16     typically the pontoon boat is the boat that was
17     always in that slip.
18 Q Was that the largest of his boats?
19 A That was the largest, he would pay for the one
20     largest boat.
21 Q Was there anything that prohibited him from using
22     that slip once he had paid for the largest boat to
23     use it for either of his other boats?
24 A No.

- 17 -

1 A I would say I think always is a word that -- how
2     could I guarantee always when I'm dealing with
3     natural elements.
4 Q I understand. Let's ask the question this way
5     then.
6          During your typical high and low tides
7     on the Essex river, the idea would be that
8     somebody with a wet slip would be able to pull
9     their boat in and take it back out and be in the
10     water at all times; am I correct?
11 A Yes.
12 Q Now what about a mud slip, what does that connote
13     in your mind?
14 A A mud slip is a slip that doesn't have access to
15     the water at all times. It's subject to some
16     tidal conditions.
17 Q And was Ted Marshall's slip a water slip or a mud
18     slip?
19 A It was a water slip.
20 Q And has it always been leased to him as a water
21     slip?
22 A Yes, the slips when you down the gangway and
23     you're walking on the main physical structure of
24     the pier system, on the left side is -- the left

- 19 -

**North Shore Court Reporting - (978) 281-6886**


Exh. "C"

Page 20:

```
1     side is the side that borders the river. The left
2     side is the side that has access to the water at
3     all times. The right side is different because
4     you have to get to the end of the system to access
5     the river. When the tide recedes, the right side
6     is in the mud and then as the tide rises, the
7     right side is in the water and it's not a problem
8     to get out.
9  Q  But Mr. Marshall's slip again is on the left side
10    and it's always been considered a water slip;
11    right?
12 A  Yes.
13 Q  Did you ever have any discussions with Mr.
14    Marshall either at the beginning when he first
15    leased the slip regarding the fact that it was a
16    water slip? Do you have any specific memories of
17    any conversations you had with him about that?
18 A  I don't remember a specific conversation.
19 Q  Was it your understanding that he wanted a water
20    slip?
21 A  Yes.
22 Q  Was it your understanding that he wanted a slip
23    that he could get in and out of and didn't have to
24    worry about the tides?
```

Page 21:

```
1  A  Yes.
2  Q  And then once you've determined whether a slip is
3     water or mud then you apply it to the footage of
4     the boat; is that correct?
5  A  Yes.
6  Q  You testified earlier that you understood that
7     Mr. Marshall used the boats -- well, strike the
8     question.
9         He had a business that was related to
10    working on the Essex River; correct?
11 A  He always filled out the application as Agawam
12    Boat Charters.
13 Q  Over all the years of knowing Mr. Marshall, did
14    you have any understanding of what his business
15    is?
16 A  The one facet of his business that I understand is
17    the pontoon boat because I actually hired him one
18    summer. He took my family out to the back side of
19    Crane's Beach and picked us up and took us back.
20    So that's what I understand he does is he takes
21    people out for tours or, you know, boat
22    transportation.
23 Q  Did you have any knowledge that he took people out
24    fishing?
```

Page 22:

```
1  A  No.
2  Q  In any event you knew that the pontoon boat that
3     he kept there he used for business; correct?
4  A  Yes, charters.
5  Q  Did you ever see the boat that was damaged in this
6     accident in that slip in the years that you were
7     managing?
8  A  No. I always saw the pontoon boat.
9  Q  Did you have occasion to go down there from time
10    to time? It sounds like you did.
11 A  If I drive through Essex, I usually look over to
12    see what's there. Not in detail, I just look and
13    the pontoon boat is very unique and it's always in
14    the same place.
15 Q  And it's fair to say then in the time that
16    Mr. Marshall leased that slip from Filias that
17    the understanding was that that slip would be --
18    could safely accommodate the pontoon boat;
19    correct?
20 A  Yes.
21 Q  And you understood that he did list other boats on
22    his application typically; correct?
23 A  Yes.
24 Q  Do you know whether the boat that was damaged in
```

Page 23:

```
1     this accident was one of the boats that he
2     typically would list on his application as a boat
3     that might be in that slip from time to time?
4  A  I can't say that I definitively knew that.
5  Q  Would it be fair to say that in any event with it
6     being a water slip that the understanding would be
7     that slip could safely accommodate this other boat
8     as well?
9  A  Well the pontoon boat is a big boat so I think I
10    would safely assume that anything smaller than the
11    pontoon boat it would be okay. Anything bigger
12    then the pontoon boat I think it would give me
13    cause for concern.
14 Q  But your understanding is that the largest boat he
15    had in terms of length was the pontoon; right?
16 A  That's what he paid for, the largest boat.
17 Q  I guess what I'm asking you, Mrs. Filias', is at
18    the time that each and every one of these leases
19    including the 2004 lease were, you know, the
20    agreement was put into place, Filias held the
21    understanding that that slip would be safe for
22    Mr. Marshall to use his boats in; right?
23 A  Yes.
24 Q  You certainly didn't think there was anything
```

**Page 24**

1  unsafe about this slip for his boats; right?
2  A  No.
3  Q  Over the years, Mrs. Filias, when you would --
4     strike the question. I don't know that I
5     established that you did this.
6        Were there times where maybe you were
7     going to show an apartment to somebody there and
8     you would actually walk down and take a look
9     around the slips or was that left to Alex more or
10    less to keep an eye on what was going on in the
11    slips?
12 A  If I was on the property, I might take a look. I
13    would take a look to see -- sometimes people can
14    abuse privileges so I would always take a look to
15    see if there was some strange boat there or a boat
16    tied to another boat, any situation that might
17    cause harm to the people that were supposed to be
18    there. If someone wanted to go and have a
19    cocktail at Tom Shea's they might tie up to a boat
20    that was supposed to be there and cause harm to
21    that boat. I would just look for unusual things
22    that might not be appropriate.
23 Q  Now over the years, I guess here's my question,
24    if you know, has there been any general trend in

**Page 25**

1     terms are what are mud slips and what are water
2     slips? In other words has that changed from year
3     to year since you've been managing?
4  A  No, it's always been the left side is water, the
5     right side is mud.
6  Q  So as the yearly processes of the Essex River take
7     place, you haven't noticed any significant changes
8     in terms of how that impacts what's a mud slip and
9     what's a water slip vis-a-vis your dock?
10 A  No.
11 Q  The agreements that -- the extent of the writings
12    between Filias and the lessees I think is just
13    simply that invoice you sent to each boat owner;
14    is that right?
15 A  It's an initial application to ask them what
16    they'll be putting out there so that I know what
17    size it is and then it's followed up with an
18    invoice that reiterates the type of the boat, the
19    size of boat and the balance due for that boat
20    less the $250.00 deposit that they had already
21    sent in.
22 Q  Do you ever have situations, you out of
23    curiosity, where people tell you they're putting a
24    sixteen foot boat in there and they put a twenty-

**Page 26**

1     two foot boat in there?
2  A  No, most of the people that are on those boat
3     slips have been there as long as Ted and they just
4     come back every year. It's a very -- very much an
5     honor system. They know their slip will be there
6     for them and I know that they'll pay for what they
7     ask for.
8        MR. McCORMICK: Let's go off the record
9     for a second.
10       SHORT BREAK
11 Q  Let me just show you a document, Ms. Filias, and
12    I'll just ask you if you can identify that for me
13    please.
14 A  This is the application that I would have sent out
15    in the winter with a letter asking for the deposit
16    and this is the application that describes what
17    they'll be putting on the boat slip.
18       MR. MCCORMICK: Why don't we mark that
19    as Exhibit Number 1.
20       (Exhibit Number 1, so marked:
21    Application - Filias Realty Trust.)
22 Q  While we're working the documents, let me just
23    show you this, that was marked as Alex' deposition
24    too and I'll ask you if you can recognize that

**Page 27**

1     document.
2     This is the invoice, the subsequent invoice.
3  Q  So just so we're clear, this is what Mr. Marshall
4     would have sent you in terms of information.
5  A  Yes.
6  Q  And this was in 2004, but this is something that
7     you do yearly; correct?
8  A  This is something I do yearly.
9  Q  And then you figure out what the pricing would be
10    -- well he would send this back with a deposit?
11 A  Yes.
12 Q  And you would invoice him for the balance after
13    that; correct?
14 A  Correct.
15       MR. MCCORMICK: Why don't we mark that,
16    Geri, as two please.
17       (Exhibit Number 2, so marked: Invoice.)
18 Q  So other than these two documents, there's no
19    formal written contract between you and
20    Mr. Marshall; correct?
21 A  Correct.
22 Q  And that's the same with all the boat owners;
23    right?
24 A  Yes.

**Page 28**

1  Q  Are there any rules or regulations or anything
2     like that that you give to boat owners additional
3     in terms of do's and don'ts let's say?
4  A  The biggest rule is parking, is related to
5     parking. They're only allowed to bring one car on
6     the property for each boat. I ran into a
7     situation where one boat owner would bring six of
8     their friends in six cars and because it's a
9     residential property with needs of people who live
10    there I had to limit the number of cars to just
11    one. So that's the biggest rule, parking.
12 Q  So as far as you know, there are no -- are there
13    any other rules that you can think of whether
14    they're written or not having to do with the way
15    people use their slips?
16 A  No.
17 Q  Are there any rules and you just said no, but I'm
18    just going to ask you a couple of specifics, are
19    there any rules with respect to if one vessel is
20    let's say tied up in a way that such that it might
21    potential damage another vessel, would Filias or
22    it's representatives have a right to go in and
23    move the boat or something of that nature?
24 A  No rules. As I mentioned before, most of the

**Page 29**

1     people that rent those boat slips have all been
2     down there together for eight, ten plus year. So
3     if they see something that looks like it could be
4     harmful to their neighbor's boat, they pretty much
5     self-manage. They'll call their friend to say
6     you're cleat -- or they'll call me to say the
7     cleat is loose but if their boat is loose from the
8     cleat they'll call their friend and say your boat
9     is loose. Or if they can't reach their friend
10    they'll call me and I'll send Alex. There's no
11    rule.
12 Q  They'll just grab it and tie it up themselves;
13    right?
14 A  Yes.
15 Q  Again, in a typical scenario, Mrs. Filias, in
16    terms of written communications back and forth
17    with a boat owner for any particular season we're
18    pretty much looking at the documents; correct? In
19    other words there's no other letters or anything
20    else that go back and forth between you and the
21    lessee other than the application and the invoice
22    for the most part?
23 A  Just the letter that goes with this asking for the
24    $250 deposit.

**Page 30**

1  Q  And then I think I saw at one point, I don't think
2     I need to bring it out but you did send a letter
3     out about the one car rule?
4  A  One car rule.
5  Q  To all the boat owners; right?
6  A  I just can't remember if I do that with the
7     deposit or if I do that with the invoice. I think
8     I do it with the invoice to refresh everybody's
9     memory going into the summer that it's just one
10    car.
11    Have you ever had any complaints over the years
12    that you've been managing the slips from any of
13    the boat owners saying gee, you know, I leased
14    this as a wet slip and it's not a wet slip
15    anymore, it's mud?
16 A  Never.
17 Q  Again, when you send this application out, you're
18    looking for the length of the boat so you can set
19    your price; right?
20 A  The length and the description so that I can set
21    the price -- invoice the person and also go back
22    afterwards and make sure the description of the
23    boat fits.
24 Q  So you have that information so that again if you

**Page 31**

1     see a boat that doesn't belong in a slip you'll
2     know that somebody is there that shouldn't be
3     there type of thing; right?
4  A  Right.
5  Q  Do you ask potential boat owners about what the
6     boat draws in terms of how much water it draws?
7  A  No.
8  Q  You know what I mean by draw?
9     I do.
10 Q  In terms of the general understanding between you
11    and Mr. Marshall, which I think we've covered with
12    respect to the slip, the only thing that's changed
13    over the years is the price changes; correct?
14 A  Correct.
15 Q  Other than that the understanding is pretty much
16    the same, he'll rent the slip number one from you
17    and he'll pay you for it?
18 A  Right. And you get a hose and water.
19 Q  Again, that at all times during those years that
20    Mr. Marshall was getting a slip that could safely
21    accommodate his vessels; correct?
22 A  Correct.
23 Q  Now at some point, Mrs. Filias, did you learn that
24    Mr. Marshall's boat had been damaged while at slip

Exh. "C"

### Page 32

1  number one, did you hear that?
2         MS. ARNOLD: Objection.
3  A  Yes.
4  Q  How did you find that out?
5  A  I think that sometime during the day I
6     communicated with my husband and he told me that
7     Ted's boat had been punctured and took on water.
8  Q  Did you ever learn from any source what everyone
9     seems to understand was the cause of the damage to
10    the boat?
11 A  Whatever information I received was through Alex.
12    So as he discovered what happened, I discovered
13    what happened.
14 Q  Did you yourself ever physically go down to the
15    site during those days or two following the
16    accident?
17 A  No, I did not.
18 Q  Do you have any understanding as to whether they
19    did pull some submerged pilings out of that site?
20 A  I know they pulled pipe.
21 Q  They pulled some pipes out of the slip; is that
22    your understanding?
23 A  Yes.
24 Q  Do you know who did that?

### Page 33

1  A  Something mooring and dive, dive and mooring.
2     Anchor Dive & Mooring?
3  Q  I think that's it, yeah. And did you ever go down
4     and see what they pulled out, you personally?
5  A  I think at one point -- I don't think I ever saw
6     what was pulled out. Actually I think before it
7     was pulled out I did go down to the docks but
8     Ted's boat wasn't there and I just saw the pipe in
9     the mud under the water. They had a stick in it
10    and I just saw that but I didn't see anything else
11    after that.
12 Q  So you saw it when it was still submerged?
13 A  Yeah.
14 Q  And could you see that visibly from the top of the
15    dock?
16 A  Well I could see the stick that they put it in it.
17    By the time I got there the tide had come up so I
18    could see through the murky water that there was
19    something there with a stick in it but I couldn't
20    give you any detail. I mean other than it was a
21    pipe.
22 Q  Would it have been that day you think you went
23    down, the actual day that it happened?
24 A  Honestly I don't think it was that day. I just

### Page 34

1     think it was in the days following what happened.
2     I think I was just curious because it was a shock
3     that this whole thing even happened. So I did go
4     down there but as I mentioned, Ted's boat was not
5     there anymore and the guys had already been down
6     there marching around in the mud and trying to
7     determine what had happened.
8  Q  Prior to the date that this happened with
9     Mr. Marshall, had you ever gotten any complaints
10    from any of your other customers regarding any
11    submerged objects in their slips?
12 A  No.
13 Q  During the time that you were managing the
14    property, did they ever dredge those slips?
15 A  No, we received permission to dredge but the river
16    is small and all the equipment that is required to
17    dredge is too big and not cost effective to bring
18    down the river. So we were never actually able to
19    dredge.
20 Q  Was that when you did your 91 permit, is that when
21    you got permission to dredge?
22 A  Yeah.
23 Q  But it was cost prohibitive to do that?
24 A  Correct.

### Page 35

1  Q  Did you actually get a quote from somebody?
2  A  Um hmm.
3  Q  Yes?
4  A  Forty thousand dollars just to bring the equipment
5     to the site.
6  Q  And that was before they even started working?
7  A  Right.
8  Q  Do you remember who you got the quote from on
9     that?
10 A  I don't.
11 Q  Do you know if you have any paperwork related to
12    that quote that you can think of in your file
13    anywhere?
14    It was very, you know, sort of loose over the
15    phone, oh, you want me to come down the river,
16    that's going to cost you this, type of thing.
17 Q  Right, okay.
18 A  Before we even start that will cost you this.
19 Q  Just to get the stuff there.
20 A  Just to get the stuff there.
21 Q  Did you, did Filias -- would you have keys to the
22    various boats in case of an emergency?
23 A  No.
24 Q  Did Mr. Marshall always pay his invoices timely to

```
 1  you?
 2  A  Yes.
 3  Q  And in 2004 did he pay timely?
 4  A  Yes.
 5         MR. MCCORMICK: I think that covers what
 6  I wanted to cover, Mrs. Filias, I think that was
 7  all I wanted to ask was really about the
 8  contractual end of things.
 9         MS. ARNOLD: I do not have any
10  questions.
11         (Whereupon, the deposition was concluded
12  at 11:47 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
```

- 36 -

## CERTIFICATE

I, PAULA FILIAS, do hereby certify that I have read the foregoing transcript of my testimony and further certify that said transcript is a true and accurate record of said testimony and signed under the pains and penalties of perjury.

Dated this _____ day of _____ 2005.

PAULA FILIAS

## CERTIFICATE

I, Geraldine R. Parisi, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing record, Pages 1 to 36, inclusive, is a true and accurate transcript of my Stenoscribe System, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my Notarial Seal this 22nd day of September, 2005

Geraldine R. Parisi, Notary Public
PROFESSIONAL COURT REPORTER

My Commission expires: August 25, 2006

The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying Reporter.

## ERRATA SHEET

Date of Deposition: September 12, 2005
Case Name: Edward Marshall vs. Filias Realty Trust
DOCKET NO. 04-12029 DPW
Deponent's Name: PAULA FILIAS

I, the undersigned, do hereby certify that I have read the foregoing deposition transcript and that to the best of my knowledge, said deposition transcript is true and accurate (with the exceptions of the following changes listed below):

PAULA FILIAS
Dated

Page No. Line No. Correction
Page No. Line No. Correction
Page No. Line No. Correction
Page No. Line No. Correction
Page No. Line No. Correction
Page No. Line No. Correction
Page No. Line No. Correction
Page No. Line No. Correction
Page No. Line No. Correction

Exh. "C"