```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

EDWARD MARSHALL,
     Plaintiff,

     v.                                   CIVIL ACTION NO.
                                          04-12029-MBB
FILIAS REALTY TRUST,
     Defendant.
```

**MEMORANDUM AND ORDER RE:
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
ON COUNT I OF HIS COMPLAINT
(DOCKET ENTRY # 16)**

**July 18, 2006**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment filed by plaintiff Edward Marshall ("plaintiff") on Count One of the complaint. (Docket Entry # 16). The complaint, filed September 20, 2004, seeks recovery in Count One for breach of an oral contract by defendant Filias Realty Trust ("defendant") and in Count Two for negligence of defendant.

STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Seaboard Surety Co. v. Town of Greenfield, 370 F.3d 215, 218 (1st Cir. 2004). A factual issue is "genuine" where "the

evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party." Blackie v. State of Maine, 75 F.3d 716, 721 (1st Cir. 1996). A factual issue is "material" where it "has the potential to alter the outcome of the suit under the governing law." Id.

The burden initially rests with the party seeking summary judgment to demonstrate that "no genuine issue of material fact exists." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). The party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . party's pleading." Fed. R. Civ. P. 56(e). The nonmovant, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Triangle Trading Co. v. Robroy Ind., Inc., 200 F.3d 1, 2 (1st Cir. 1999). Factual disputes must be resolved in a "light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995).

FACTUAL BACKGROUND

Defendant Filias Realty Trust[1] ("Trust") is the owner of approximately 16 boat slips adjacent to the Essex Landing

---

[1] The trust entity is also known as New Filias Main Street Realty Trust. (Docket Entry # 17, Ex. C, pp. 8-9).

Apartments in Essex, Massachusetts.  (Docket Entry # 17, Ex. C, pp. 8-10; Docket Entry # 17, Ex. A).  Alex Filias ("Filias") and another member of the Filias family are trustees of the Trust.  Another entity, Filias Management, manages the properties that the Trust holds.  (Docket Entry # 17, Ex. C, pp. 6 & 7).  Filias' wife, Paula Filias, is Manager of Filias Management.  (Docket Entry # 17, Ex. B, p. 48; Docket Entry # 17, Ex. C, p. 6).  Filias Management is responsible for the billing and the renewal of leases for the Essex Landing Apartments and the adjacent boat slips.  (Docket Entry # 17, Ex. C, p. 9).  There is also an entity known as the Filias Construction Company ("Filias Construction") which, among other things, performs repairs on the properties that the Trust owns.  (Docket Entry # 17, Ex. C, p. 8).  Filias is President of Filias Construction.  (Docket Entry # 17, Ex. B, p. 8).

   The slips existed when the Filias family bought the Essex Landing Apartments in the 1970s.  (Docket Entry # 17, Ex. B, pp. 22 & 23).  At that time, the floatation units and the steel pilings that held the slips in place were taken out every winter and put back when the boating season commenced.  (Docket Entry # 17, Ex. B, p. 28).  Every season, steel pipes were driven into the riverbed and chains were tied from the floatation units to the pipes to secure the slips' position.  (Docket Entry # 17, Ex. B, pp. 29 & 30).  Filias and other employees of Filias

Construction were responsible for setting up the slips for use each season. (Docket Entry # 17, Ex. B, pp. 17 & 34). In 1998, to comply with a Massachusetts Department of Environmental Protection ("DEP") license pursuant to Massachusetts General Laws chapter 91, the slips underwent a reconfiguration. (Docket Entry # 17, Ex. B, pp. 23 & 24). Filias hired an engineering firm to plan and design the new slips. (Docket Entry # 17, Ex. B, pp. 25 & 35). Filias Construction carried out the work of executing the engineering plans. (Docket Entry # 17, Ex. B, p. 42). The license by the DEP granted Filias a permit allowing him to dredge the area where the slips were to be located. Due to the high cost, however, dredging was never done. (Docket Entry # 17, Ex. B, p. 42; Docket Entry # 17, Ex. C, pp. 34 & 35). After the reconfiguration, the floatation units and steel pilings were still removed after the boating season and replaced when the boating season recommenced with the same steel pipes and chain mechanism. (Docket Entry # 17, Ex. B, pp. 43 & 44).

In 2003, pursuant to the DEP permit issued in 1998, Filias replaced the seasonal metal pilings with permanent wood pilings that could be left in year round.[2] (Docket Entry # 17, Ex. B,

---

[2] The record does not reflect the specific date(s) in 2003 when the pilings were replaced. The permanent wood pilings were then removed and redriven at an unspecified date in 2004 in order to remove ice in the Essex River. (Docket Entry # 17, Ex. B, pp. 65-66).

pp. 55 & 56).

The floatation units would then be tied to the permanent wood pilings each season. (Docket Entry # 17, Ex. B, p. 59). Filias hired Marston[3] to do the work of replacing the pilings since he had the necessary equipment. (Docket Entry # 17, Ex. B, pp. 57 & 58). During the construction, Marston and Filias carefully inspected the surrounding area of the slips for any debris and removed them. (Docket Entry # 17, Ex. B, pp. 62 & 68). Among the debris were items such as a lobster trap, a bench [sic] chair and rope. (Docket Entry # 17, Ex. B, p. 54). Defendant neither monitors the tides that affect the slips, nor measures variations in the water level of the slips from year to year. (Docket Entry #17, Ex. B, p. 73-75).

Plaintiff owns a small motor boat, a cruising or fishing vessel, and a pontoon boat. (Docket Entry # 17, Ex. B, pp. 77 & 78). For at least ten years, plaintiff has consistently leased slip number one from defendant for the purpose of docking his various boats. (Docket Entry # 17, Ex. C, p. 14). The lease price for a particular slip is conditioned upon whether the slip is considered a "water" slip or a "mud" slip. (Docket Entry # 17, Ex. C, p. 18). A "water" slip is one having access to the water at any time of the day while a "mud" slip is one having access to the water only during certain tidal conditions.

---

[3]   The record does not reflect Marston's full name.

5

(Docket Entry # 17, Ex. C, pp. 18 & 19).  The lease price is calculated on a per foot basis at the standard rate that season. (Docket Entry # 17, Ex. C, p. 15).  The per foot calculation is based on the largest boat a lessee could dock at the slip.  In plaintiff's case, the price was calculated based on the footage of his pontoon boat, the largest of his boats, and the slip being a "water slip."  (Docket Entry # 17, Ex. C, pp. 17 & 20).  It was agreed, however, that plaintiff could use the slip for his smaller boats.  (Docket Entry # 17, Ex. C, pp. 17 & 18).

   The lease at issue in this matter pertains to the 2004 season.  There is an invoice (Docket Entry # 17, Ex. E) and an initial application (Docket Entry # 18, Ex. C) evidencing the lease of the slip but no written contract specifically setting forth the terms of the agreement.  (Docket Entry # 17, Ex. C, pp. 25-27; Docket Entry # 17, Ex. B, p. 83).  The 2004 application for the slip notes plaintiff's pontoon boat and his fishing boat. (Docket Entry # 18, Ex. C).

   Defendant provided a water slip to berth plaintiff's boats.[4] (Docket Entry # 17, Ex. C, pp. 19-21).  The parties also understood the slip as being of safe and useable quality. (Docket Entry # 17, Ex. B, p. 81).  Paula Filias testified at her deposition as to the nature of the slip:

---

[4] Plaintiff states that he paid for a water slip but instead believes he received a mud slip.  (Docket Entry # 17, p. 6).

> Q: I guess what I'm asking you, Mrs. Filias, is at the time that each and every one of the leases including the 2004 lease were, you know, the agreement was put into place, Filas [Trust] held the understanding that that slip would be safe for Mr. Marshall to use his boats in, right?
>
> A: Yes.
>
> Q: You certainly didn't think there was anything unsafe about this slip for his boats, right?
>
> A: No.

(Docket Entry # 17, Ex. C, p. 23-24). Filias similarly testified about the safety of the berth:

> Q: Do you know whether anybody from Filias told [plaintiff] or represented to [plaintiff] that that slip would safely and reasonably accommodate his boat?
>
> A: I believe so.[5]

(Docket Entry # 17, Ex. B, p. 81). Accordingly, for purposes of summary judgment, the parties' unwritten contract included the term that the slip was safe to accommodate the use of plaintiff's boats.

On June 4, 2004, the 23 foot fishing vessel that plaintiff owns and operates was damaged. Filias was working at the pier that day and saw that plaintiff was trying to bring the boat up on shore to keep it from sinking. (Docket Entry # 17, Ex. B, pp. 87 & 88). Filias used his water pump to assist plaintiff to

---

[5] Such "operative" words are not hearsay. See Fed. R. Evid. 801(c); Shimer v. Foley, Hoag & Eliot LLP, 795 N.E.2d 599, 604 (Mass. 2003) (operative words evidencing contract offer are not subject to hearsay rule); see also Telecon, Inc. v. Emerson-Swan Inc., 461 N.E.2d 1227, 1228 (Mass. 2003).

7

displace water from the fishing vessel.  (Docket Entry # 17, Ex. B, p. 89).  Another boat then towed the fishing vessel to another dock to be brought up on the shore.  (Docket Entry # 17, Ex. B, pp. 90 & 91).  When it was brought up, the source of the leak was found to be two holes, one in the bow on the starboard side and the other in the stern on the port side.  (Docket Entry # 17, Ex. B, p. 91; Docket Entry # 17, Ex. D, No. 9).  Subsequently, plaintiff discovered a pole protruding from the river bed in slip number one.[6]  (Docket Entry # 17, Ex. B, p. 95).

## DISCUSSION

As a preliminary matter, federal maritime law applies to "tort and contract actions arising out of the storing and maintaining of boats in a marina on navigable waters."  Burklow & Associates, Inc. v. Reagan Belcher, et al, 719 So.2d 31, 35 (Fla.App. 1 Dist. 1998); see also Bird v. S.S. Fortuna, 232 F.Supp. 690, 691 (D.Mass. 1964) (contract for mooring a vessel sounds in admiralty).

Plaintiff claims that the hole punctures on the fishing vessel caused by the pole embedded in the bottom of the slip evidences that the slip was not of a safe and usable quality and defendant thus breached that term of the parties' oral contract.

---

[6] Defendant does not appear to dispute that the pole caused the holes in plaintiff's boat.

In reply, defendant maintains that plaintiff has no claim in contract and further disputes the terms of the oral contract.

Maritime contracts do not require a writing for validity, Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961), and general maritime law recognizes and enforces oral contracts. American Dredging Co. v. Miller, 510 U.S. 443, 451 (1994). "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Management Systems, Inc. v. Malouf, Inc., 724 N.E.2d 699, 701 (Mass. 2000).

"Ordinarily the question whether a contract has been made is one of fact." Bresky v. Rosenberg, 152 N.E. 347, 351 (Mass. 1926). "If the evidence . . . is uncontradicted, [however,] the question is for the court . . .." Id. at 351. Both parties admit to the existence of a contract. (Docket Entry # 17, Ex. A, p. 2). This court finds that an oral contract existed between plaintiff and defendant. As elucidated in the factual background, the undisputed facts further show that the parties agreed to price and duration of the contract and that the leased slip was a water slip. The parties also agreed that the leased water slip was safe to accommodate the use of plaintiff's boats.

While admitting to the existence of an oral contract, defendant asserts that the term that the slip was safe to accommodate plaintiffs boats, or, stated otherwise, was of good

9

and serviceable quality, was not a *material* term of the contract. (Docket Entry # 17, Ex. A, p. 2).  Materiality is a familiar concept in the law.  Sibcoimtrex, Inc. v. American Food Group, Inc., 241 F.Supp.2d 104, 109 (D.Mass. 2003).  A "material" term is defined as "[o]f such a nature that knowledge of the item would affect a person's decision-making process; significant; essential . . .."  Id. at 109 (quoting Black's Law Dictionary 991 (7th Ed. 1999)).  "Ultimately, whether a term is material should be judged in the specific context of all relevant facts and circumstances."  Sibcoimtrex, Inc. v. American Food Group, Inc., 241 F.Supp.2d at 109.

    Logically, the plaintiff would not enter into a contract to berth his boats, which represent his commercial livelihood, without the understanding that the berth would be safe and usable for the agreed upon purpose.  Defendant has offered no further evidence to establish that the alleged term was not material to the contract.  Furthermore, a water slip, by its definition, should contain adequate water at all times.  That the boat was damaged by a pole protruding inches from the riverbed of the slip suggests that the water slip did not contain a sufficient level of water.  Defendant puts forth no evidence of extreme tidal fluctuations at or before the time of the accident.  Thus, this court finds that a material term of the contract was the lease of a water slip of safe and useable quality in which plaintiff could

berth his boats.  This term was breached when plaintiff's boat was damaged by the pole protruding from the bottom of the slip.

Defendant additionally argues that plaintiff may not maintain an action based in contract.  Rather, defendant maintains that this action sounds only in tort.  "There is little practical difference between the elements of proof in a tort action for negligence and a contract action for the negligent provision of  . . . services."  Hebert A. Sullivan, Inc. v. Utica Mutual Insurance Company, 788 N.E.2d 522, 532 (Mass. 2003).  "Although the duty arises out of the contract and is measured by its terms, negligence in the *manner of performing* that duty as distinguished from mere *failure to perform* it, causing damage, is a tort."  Abrams v. Factory Mutual Liability Ins. Co., 10 N.E.2d 82, 84 (Mass. 1937) (emphasis added); see also Hartford Casualty Ins. Co. v. New Hampshire Ins. Co., 628 N.E.2d 14, 16 (Mass. 1994) (negligent performance is a tort, negligent nonperformance is a contract action).  The court in Abrams, however, allowed simultaneous actions in tort and contract and held that a plaintiff could maintain actions in contract for both nonperformance and negligent performance.  Abrams, 10 N.E.2d at 83.  "Plaintiff can maintain an action of contract against the defendant if, without excuse, the defendant wholly refused to defend."  Id.  "He can likewise maintain an action of contract if the defendant defended negligently."  Id.

Defendant relies on <u>Hebert A. Sullivan, Inc. v. Utica Mutual Insurance Company</u>, 788 N.E.2d 522 (Mass. 2003), to assert a claim in tort rather than in contract.  The facts of the instant case, however, are distinct from the facts in <u>Sullivan</u>.  The court in <u>Sullivan</u> found that the defendant discharged its duty to the plaintiff under the contract terms by appointing counsel in a legal matter according to a clause in the written contract.  <u>Hebert A. Sullivan, Inc. v. Utica Mutual Insurance Company</u>, 788 N.E.2d at 532.  The court thus held no breach of contract but upheld a cause of action in tort arising outside of the defendant's contractual obligations.  <u>Id</u>.  In the instant case, defendant's contractual duty to plaintiff was never discharged since the existence of a safe and usable berth was material to the contract at all times.  Plaintiff therefore correctly maintains an action in contract.

In sum, the evidence before this court indicates that there was an oral contract between plaintiff and defendant which defendant breached when it failed to provide plaintiff with a safe and usable water slip in which to berth his boat.

<u>CONCLUSION</u>

In accordance to the foregoing discussion, the motion for summary judgment as to Count I (Docket Entry # 16) is **ALLOWED**.

```
                              /s/   Marianne B. Bowler
                         MARIANNE B. BOWLER
                         United States Magistrate Judge
```